# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2021AP1343 & 2021AP1382 |

| | |
|---|---|
| COMPLETE TITLE: | Jeffrey Becker, Andrea Klein and A Leap Above Dance, LLC, |
| |            Plaintiffs-Appellants, |
| |     v. |
| | Dane County, Janel Heinrich and Public Health of Madison & Dane County, |
| |            Defendants-Respondents. |

ON BYPASS FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 8, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 8, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dane |
|   JUDGE: | Jacob B. Frost |

JUSTICES:

KAROFSKY, J., delivered the majority opinion of the Court with respect to ¶¶1-28 and 44-45, in which ANN WALSH BRADLEY, DALLET, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶29-43, in which ANN WALSH BRADLEY and DALLET, JJ., joined. HAGEDORN, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiffs-appellants, there were briefs filed by *Rick Esenberg, Luke N. Berg, Anthony F. LoCoco, Daniel P. Lennington* and *Wisconsin Institute for Law & Liberty*, Milwaukee. There was an oral argument by *Luke N. Berg*.

For the defendants-respondents, there were briefs filed by *Remzy D. Bitar, Sadie R. Zurfluh*, and *Municipal Law* and

*Litigation Group, S.C.,* Waukesha. There was an oral argument by *Remzy D. Bitar.*

An amicus curiae brief was filed by *Daniel R. Suhr* and *Liberty Justice Center*, Chicago, for Liberty Justice Center.

An amicus curiae brief was filed by *Terman Spencer*, city attorney, *Gregory P. Kruse*, assistant city attorney, *Claire Silverman,* and *Maria Davis* for The City of Milwaukee and League of Wisconsin Municipalities.

An amicus curiae brief was filed by *Jessica L. Thompson*, *Matthew Fernholz*, and *Pacific Legal Foundation*, Arlington, and *Cramer, Multhauf & Hammes, LLP*, Racine, for the Pacific Legal Foundation and National Federation of Independent Business Small Business Legal Center.

An amicus curiae brief was filed by *Brian P. Keenan*, assistant attorney general, with whom on the brief was *Joshua L. Kaul*, attorney general, for Governor Tony Evers and Attorney General Josh Kaul.

An amicus curiae brief was filed by *patricia Epstein Putney, Melita M. Mullen, Jeffrey B. Dubner, Jessica Anne Morton*, and *Bell, Moore & Richter, S.C.,* Madison, and *Democracy Forward Foundation*, Washington, D.C., for the American Medical Association and Wisconsin Medical Society.

An amicus curiae brief was filed by *Allison W. Boldt* and the *University of Wisconsin Law School State Democracy Research Initiative,* Madison, for Legal Scholars.

An amicus curiae brief was filed by *Jeffrey A. Mandell, Douglas M. Poland, Colin T. Roth, Daniel Lenz, Elizabeth B.*

2

*Wydra, Brianne J. Gorod, Brian R. Frazelle, Miriam Becker-Cohen,* and *Stafford Rosenbaum LLP,* Madison, *Law Forward, Inc.,* Madison, and *Constitutional Accountability Center*, Washington, D.C., for Julian Davis Mortenson, Professor of Constitutional History.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2021AP1343 & 2021AP1382
(L.C. No.  2021CV143)

STATE OF WISCONSIN            :       IN SUPREME COURT

**Jeffrey Becker, Andrea Klein and**

**A Leap Above Dance, LLC,**

          **Plaintiffs-Appellants,**                    **FILED**

  **v.**                                               **JUL 8, 2022**

**Dane County, Janel Heinrich and**                    Sheila T. Reiff
                                                       Clerk of Supreme Court
**Public Health of Madison & Dane County,**

          **Defendants-Respondents.**

---

KAROFSKY, J., delivered the majority opinion of the Court with respect to ¶¶1-28 and 44-45, in which ANN WALSH BRADLEY, DALLET, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶29-43, in which ANN WALSH BRADLEY and DALLET, JJ., joined. HAGEDORN, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.

---

APPEAL from a judgment and an order of the Circuit Court for Dane County, Jacob B. Frost, Judge. *Affirmed and cause remanded.*

¶1   JILL J. KAROFSKY, J.   We resolve whether local health officers may lawfully issue public health orders. This suit

arises from a challenge to a local health officer's issuance of public health orders to prevent, suppress, and control a communicable coronavirus disease commonly referred to as COVID-19. The case before us does not challenge the wisdom or legality of any particular measure taken in these orders. The challenge instead raises more general statutory and constitutional questions about the local health officer's authority to issue an order at all, regardless of the measures it promulgates. Specifically, we address three issues: (1) whether Wis. Stat. § 252.03 (2019-20)[1] authorizes local health officers to issue public health orders; (2) whether Dane County Ordinance § 46.40 (December 2020),[2] which makes such public health orders enforceable by a civil citation, is preempted by state law; and (3) whether either of these provisions constitute an unconstitutional delegation of legislative power.

¶2 On the statutory question, we hold that Wis. Stat. § 252.03 grants local health officers the authority to issue orders. As for preemption, we hold that no state law preempts Dane County Ordinance § 46.40. Finally, on the constitutional question, we hold that a local health officer's authority to issue enforceable public health orders pursuant to Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 does not run afoul of

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

[2] All subsequent references to Chapter 46 of the Dane County Ordinances are to the December 2020 version.

2

our constitutional separation of powers. Accordingly, we affirm the circuit court's judgment and order and remand to the circuit court for further proceedings.

## I. BACKGROUND

¶3 Since March 2020, Wisconsin's state and local public health officials have issued public health orders aimed at curbing the spread of the communicable COVID-19 disease caused by the SARS-CoV-2 virus and its variants. This includes Janel Heinrich, the local health officer and director of Public Health Madison & Dane County ("Health Department"), a joint health department created by an intergovernmental agreement between the governing bodies of Dane County (the "County") and the City of Madison (the "City"). Per their agreement, the local health officer is jointly appointed by both local governments' elected chief executive officers (the County's executive and the City's mayor), subject to confirmation by both local governments' elected legislative bodies (the County's board and the City's common council). The agreement charges the Health Department and its director with the duty to implement public health policies adopted by the County and City through local ordinances, budgets, and the agreement itself. The agreement also establishes the Board of Health for Madison and Dane County ("Board of Health"), comprising of one County board supervisor, one City common council member, three County residents, and three City residents. Under the agreement, the Board of Health governs the Health Department's administration and supervises its director.

3

¶4 Heinrich responded to the appearance of the communicable COVID-19 disease in her territory by issuing a series of orders from May 2020 until March 2022 that implemented measures to prevent, suppress, and control the disease's spread. She did so pursuant to her authority under state law that directs a local health officer to "promptly take all measures necessary to prevent, suppress and control communicable diseases," "do what is reasonable and necessary for the prevention and suppression of disease," and "forbid public gatherings when deemed necessary to control outbreaks or epidemics." Wis. Stat. § 252.03(1)-(2). Because COVID-19 spreads predominantly via respiratory droplets——released when an infected person breaths, coughs, sneezes, sings, or talks——that then contact the mouth, nose, or eyes of nearby persons, Heinrich's orders implemented measures that affected many aspects of daily life where people come in close proximity with others. These measures included requiring face coverings, limiting or forbidding gatherings, requiring sanitation protocols for particular facilities, limiting or forbidding certain sport activities, limiting businesses' allowable indoor capacity, and requiring physical distancing between individuals.

¶5 Around the time of Heinrich's fourth such public health order in June 2020, the County duly enacted Dane County Ordinance § 46.40 regarding the prevention, suppression, and control of communicable diseases. Relevant here, Dane County Ordinance § 46.40(2) makes it "a violation of [Dane County Ordinance ch. 46] to refuse to obey an Order of the Director of

4

Public Health Madison and Dane County entered to prevent, suppress or control communicable disease pursuant to Wis. Stats. 252.03." A violation of ch. 46 could result in a civil forfeiture of between $50 and $200 "for each day that a violation exists." Dane County Ordinance § 46.27(1).[3]

¶6 Jeffrey Becker and Andrea Klein are two County residents impacted by the Health Department's COVID-19-related orders. In January 2021, they filed this lawsuit against the County as well as the Health Department and its director, Heinrich, challenging their legal authority to issue and enforce such orders. Several days later, the Health Department separately filed an enforcement action against A Leap Above Dance, LLC ("A Leap Above") alleging that A Leap Above disobeyed a public health order. Raising similar challenges as Becker and Klein against the Health Department's enforcement authority, A Leap Above joined Becker and Klein's suit as the third plaintiff (collectively "Plaintiffs"). The Health Department then dismissed its separate enforcement action, re-filing it as counterclaims in this suit.

¶7 Plaintiffs moved the circuit court to temporarily enjoin any enforcement of current and future public health orders while the case was pending.[4] The circuit court declined to grant the temporary injunction. Because its rationale for

---

[3] Separately, one's failure to pay an assessed civil forfeiture could result in up to 30 days in county jail. Dane County Ordinance § 46.27(3).

[4] The Honorable Jacob B. Frost of the Dane County Circuit Court presiding.

5

denying Plaintiffs' motion included a determination that Plaintiffs' arguments lacked a likelihood of success on the merits, Plaintiffs asked the circuit court to enter summary judgment against them so they could appeal. The circuit court granted Plaintiffs' request and entered summary judgment against their claims but acknowledged that the Health Department's counterclaims against A Leap Above remain unresolved.

¶8 Plaintiffs appealed the summary-judgment decision; Becker and Klein as of right and A Leap Above with the court of appeals' permission.[5] Following consolidation of the appeals and completion of the briefing, Plaintiffs petitioned to bypass the court of appeals. We granted Plaintiffs' bypass petition and further ordered supplemental briefing on our jurisprudence regarding the delegation of constitutional powers.

## II. ANALYSIS

¶9 This case requires us to interpret Wis. Stat. § 252.03, determine whether state law preempts Dane County Ordinance § 46.40, and assess both provisions' constitutionality with respect to separation-of-powers principles. Each presents a question of law that we review de novo. See, e.g., Legue v. City of Racine, 2014 WI 92, ¶60, 357 Wis. 2d 250, 849 N.W.2d 837 (statutory interpretation); DeRosso Landfill Co. v. City of Oak Creek, 200 Wis. 2d 642, 652, 547 N.W.2d 770 (1996) (preemption);

---

[5] Because the Health Department's counterclaims against A Leap Above remain pending despite the summary-judgment decision, A Leap Above required the court of appeals' leave to file its appeal. See Wis. Stat. § 808.03(1)-(2).

6

State v. Horn, 226 Wis. 2d 637, 642, 594 N.W.2d 772 (1999) (a law's constitutionality).

A. Wisconsin Stat. § 252.03

¶10 The first two subsections of Wis. Stat. § 252.03 empower local health officers to take certain actions in specific circumstances:

> (1) Every local health officer, upon the appearance of any communicable disease in his or her territory, shall immediately investigate all the circumstances and make a full report to the appropriate governing body and also to the department. The local health officer shall promptly take all measures necessary to prevent, suppress and control communicable diseases, and shall report to the appropriate governing body the progress of the communicable diseases and the measures used against them, as needed to keep the appropriate governing body fully informed, or at such intervals as the secretary may direct. The local health officer may inspect schools and other public buildings within his or her jurisdiction as needed to determine whether the buildings are kept in a sanitary condition.
>
> (2) Local health officers may do what is reasonable and necessary for the prevention and suppression of disease; may forbid public gatherings when deemed necessary to control outbreaks or epidemics and shall advise the department of measures taken.[6]

We conclude the authority granted by these provisions includes the authority to act via order. We reach that conclusion based

---

[6] Subsections (3) and (4) do not provide any additional authority. They instead direct the Department of Health Services (DHS) to "take charge" if "the local authorities fail to enforce the communicable disease statutes and rules" and prohibit persons from "interfere[ing] with an investigation . . . of any place or its occupants by local health officers or their assistants," respectively. As such, those subsections are not at issue here.

7

on the common and approved meaning of the operative language, the context in which it appears, and the statutory history.

¶11 We begin by examining the words in these two subsections. Because Plaintiffs challenge not the measures taken but rather the form in which those measures were promulgated, our interpretive focus is on the operative verbs "take," "do," and "forbid." At the top, we accept Plaintiffs concession that the local health officer's authority to "forbid public gatherings" must include the authority to do so by order. Indeed, how else would a local health officer forbid a public gathering if not through an order? Thus, to give any effect to this provision of § 252.03(2), we must read it to authorize action by order. See, e.g., Legue, 357 Wis. 2d 250, ¶61 (explaining that we interpret statutes "to give effect to every word and to avoid surplusage").

¶12 Notwithstanding this concession, Plaintiffs maintain the clauses in § 252.03 using the verbs "take" or "do" fail to grant the authority to act by order. We observe that the "common and approved" meaning of the language used in these clauses——"take all measures necessary to prevent, suppress and control communicable diseases" and "do what is reasonable and necessary for the prevention and suppression of disease"—— plainly support acting by order. See Wis. Stat. § 990.01(1) (instructing that words neither technical nor statutorily defined "shall be construed according to common and approved usage"); see also Legue, 357 Wis. 2d 250, ¶61. That is to say the common and approved meanings of "take" and "do" prescribe no

8

particular mechanism by which to act; they do not exclude acting by order.[7] Therefore, the legislature's words alone would grant sufficiently broad authority for a local health officer to act via an order.

¶13 Despite this ordinary reading of § 252.03(1)-(2), Plaintiffs contend that the language in surrounding and closely related statutes indicates that § 252.03 does not authorize action by order. According to Plaintiffs, that is because these other statutes explicitly reference the authority to "issue

---

[7] Dictionary definitions confirm this common reading of "take" and "do." See, e.g., Stroede v. Soc'y Ins., 2021 WI 43, ¶12, 397 Wis. 2d 17, 959 N.W.2d 305 ("[W]e often consult a dictionary in order to guide our interpretation of the common, ordinary meanings of words."). As it is used here, "take" broadly entails "[t]o make, do, perform (an act, action, movement, etc.); to carry out." Take, Oxford English Dictionary (3d ed. 2014). The verb "do" is similarly broad, commonly meaning "[t]o perform, execute, achieve, carry out, effect, [or] bring to pass." Do, Oxford English Dictionary (3d ed. 2014).

9

orders" or to "order" specific measures.[8]  Because § 252.03 lacks similar language, the argument goes, § 252.03 does not authorize local health officers to issue orders.

¶14 While we agree with Plaintiffs that context is important, see, e.g., Legue, 357 Wis. 2d 250, ¶61 & n.30, Plaintiffs' contextual evidence provides an incomplete picture. A fuller examination of the contextual evidence undermines Plaintiffs' interpretation.  As Plaintiffs acknowledged in briefing and at oral argument, the legislature uses language other than "issue orders" or "order" that nonetheless authorizes local health officers to act via order.  Wisconsin Stat. § 252.06(1), for example, authorizes a local health officer to "require" isolation of a person, quarantines, and disinfections, which would require an order.  The next subsection, § 252.06(2), authorizes local health officers "to quarantine, isolate,

_____

[8] See Wis. Stat. § 252.02(4) (authorizing the Department of Health Services (DHS) to "issue orders" for the prevention of or the control and suppression of communicable disease, among other actions, and to "issue orders for any city, village or county by service upon the local health officer"); Wis. Stat. § 323.14 (authorizing a local government's governing body——or chief executive under certain conditions——"to order, by ordinance or resolution, whatever is necessary and expedient for the health, safety, protection, and welfare of persons and property within" its jurisdiction during an emergency); Wis. Stat. § 252.25 (penalizing the willful violation or obstruction of a "departmental [DHS] order" relating to public health); Wis. Stat. § 251.06 (authorizing a local health officer to "[e]nforce state public health statutes and rules," "any regulations" adopted by the local board of health, and "any ordinances" enacted by the relevant local government, but not referencing a local health officer's order); Wis. Stat. § 254.59 (authorizing the local health officer to "order the abatement or removal" of a human health hazard on private property and providing civil enforcement mechanisms).

10

require restrictions or take other communicable disease control measures" under specified circumstances, all of which would require an order. A related subsection, § 252.06(5), confirms that the local health officer has the power to take these measures by order. Subsection (5) permits the local health officer to both "employ as many persons as are necessary to execute his or her orders" and "use all necessary means to enforce" not only state laws and DHS orders but also "the orders . . . of . . . any local health officer." § 252.06(5) (emphases added). Even within the statute at issue here, § 252.03, Plaintiffs concede the language "forbid public gatherings" authorizes local health officers to issue orders. Given the additional contextual evidence, we are not persuaded that the power to act via an order depends solely on the words "issue orders" or "order."

¶15 Finally, statutory history further supports the conclusion that § 252.03 grants local health officials the authority to issue orders. See, e.g., Legue, 357 Wis. 2d 250, ¶61 & n.36. Dating back to Wisconsin's territorial days, public health laws authorized local officials to issue enforceable public health orders using language such as "[t]o take such measures." Specifically, the territorial law authorized "the local board of health of any city, town or village" "[t]o take such measures as they may deem effectual for the preservation of the public health in said city, town, village or township," among other powers. See Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly

11

Thereof, at a Session Commencing in November 1838, at 125 (1839). Critically, none of the listed powers used the language "issue orders" or "order"; yet the statute still criminalized the violation of "any order, or rule, or regulation, made in pursuance of the powers granted to said board of health." See id. (emphasis added).

¶16 Similarly, Wisconsin's first state legislature granted the local power to "take" measures "deem[ed] most effectual for the preservation of the public health." Importantly, this law distinguished the power to "take such measures" for the preservation of public health from the power to "make such rules and regulations" for the same purpose. See Wis. Stat. ch. 26, § 2 (1849). That distinction indicates that "take such measures" included action not by rule or regulation but by order, as subsequent sections of that same law recognized. See Wis. Stat. ch. 26, §§ 3-4 (1849) (differentiating between an "order" and a "regulation").

¶17 Later, following the 1918 Spanish Flu, Wisconsin's legislature enacted a local public health law that read:

> The local board of health . . . shall have power to establish quarantine and to order and execute what is reasonable and necessary for the prevention and suppression of disease; to forbid public gatherings when deemed necessary to control epidemics . . . .

§ 1, ch. 159, Laws of 1919 (emphasis added). A few years later, the legislature revised the public health laws including the provision related to a local board of health's authority, which then read:

12

> Local boards of health may <u>do</u> what is reasonable and necessary for the prevention and suppression of disease; may forbid public gatherings when deemed necessary to control epidemics . . . .

§ 2, ch. 448, Laws of 1922 (emphasis added). The interpretive question raised by this revision is whether the switch from "to order and execute" to "do" effectuated a substantive change in a local board of health's power.

¶18 The legislature instructs that we understand the revised statute "in the same sense as the original unless the change in language indicates a different meaning so clearly as to preclude judicial construction." Wis. Stat. § 990.001(7). We conclude that the change in language here does not "so clearly" indicate a different meaning that precludes issuing orders for two reasons. First, as explained previously, nothing about the common and approved meaning of "do" precludes acting via order; its broad definition prescribes no particular mechanism by which a local health officer might act. <u>Do</u>, Oxford English Dictionary (3d ed., 2014) ("To perform, execute, achieve, carry out, effect, [or] bring to pass"). It is therefore natural to read "may do what is reasonable and necessary for the prevention and suppression of disease" as granting permission to order private action deemed reasonable and necessary for the prevention and suppression of disease. In short, "do" is not at all inconsistent with acting via order.

¶19 Second, contemporaneous interpretations of the revised "may do what is reasonable and necessary" language understood it to continue to authorize action by order. A 1923 attorney

13

general opinion concluded that the 1922 revisions continued to authorize the same powers the prior version of the public health statutes provided. 12 Wis. Op. Att'y Gen. 646 (1923). Two years later, another attorney general opinion concluded that, under the "may do what is reasonable and necessary" provision, "the local health department may issue an order to all employers of labor prohibiting such employers from continuing in their employment persons who are unvaccinated or who fail to show a certificate of recent vaccination." 14 Wis. Op. Att'y Gen. 300-01 (1925) (emphasis added). Far from "so clearly" indicating a different meaning, these contemporaneous interpretations of "may do what is reasonable and necessary" and that language's common and approved meaning lead us to follow § 990.001(7)'s directive and read the revised "do" in the "same sense as the original," which was "to order and execute."

¶20 The same interpretation of "do" holds for the 1981 amendment of this law. That amendment made two changes relevant here: (1) it shifted the authority to "do what is reasonable and necessary for the prevention and suppression of disease" from "local boards of health" to "local health officers"; and (2) it authorized local health officers to "take all measures necessary to prevent, suppress and control communicable diseases." See § 23, ch. 291, Laws of 1981. The first change retained the same "may do what is reasonable and necessary for the prevention and suppression of disease" language and thus shifted to local health officers the same authority to act by order.

14

¶21 As for the second change, the language "take all measures necessary to prevent, suppress and control communicable diseases" also authorized action via public health order. As set out above, the verb "take," a synonym of the verb "do" in this context, is broad and contains no definitional proscription against acting via order. See Take, Oxford English Dictionary (3d ed. 2014) ("To make, do, perform (an act, action, movement, etc.); to carry out." (emphasis added)). Moreover, the "take all measures" language chosen for this added authority harkens back to the earliest local public health statutes that, as explained above, used the same language to authorize action via order. See supra, ¶¶15-16. As such, the most reasonable reading of "take all measures necessary" includes taking necessary public health measures by order.

¶22 In light of the broad common and approved meaning of § 252.03's language, the full context in which it appears, and that provision's statutory history, we hold that the authority to "do what is reasonable and necessary for the prevention and suppression of disease" and "take all measures necessary to prevent, suppress and control communicable diseases" both authorize acting via order.

## B. Preemption

¶23 We next address whether state law preempts Dane County Ordinance § 46.40. State law preempts a local ordinance when: (1) the state legislature has expressly withdrawn the power of municipalities to act; (2) the ordinance logically conflicts with state legislation; (3) the ordinance defeats the

15

purpose of state legislation; or (4) the ordinance violates the spirit of state legislation. See, e.g., DeRosso Landfill, 200 Wis. 2d at 651-52. Absent these circumstances, the County may enact ordinances in the same field and on the same subject as that covered by state legislation. See id. at 651 (citing Fox v. Racine, 225 Wis. 542, 546, 275 N.W. 513 (1937)); Wis. Stat. § 59.03(2)(a) (providing that a county board "is vested with all powers of a local, legislative and administrative character" including on the subject matter of "health").

¶24 Dane County Ordinance § 46.40, in relevant part, provides:

> (1) Duty of Director, Public Health Madison and Dane County. Pursuant to Wis. Stat. ss. 252.03(1) & (2) the Director of Public Health Madison and Dane County shall promptly take all measures necessary to prevent, suppress and control communicable diseases within Dane County, including forbidding public gatherings when deemed necessary to control outbreaks or epidemics.
>
> (2) Public Health Orders. It shall be a violation of this chapter to refuse to obey an Order of the Director of Public Health Madison and Dane County entered to prevent, suppress or control communicable disease pursuant to Wis. Stat s. 252.03.

Dane County Ordinance § 46.40(1)-(2). Plaintiffs argue that the ordinance may not lawfully authorize the local health officer to either issue orders or enforce those orders because such authority is "intentionally withheld" by state law. As for the power to act via order, Plaintiffs rely on the same argument addressed above——that Wis. Stat. § 252.03 does not authorize a local health officer to issue orders because the statute lacks the exact "issue orders" or "order" language used in related

16

statutes such as Wis. Stat. §§ 252.02 and 323.14. Again, we disagree that Wis. Stat. § 252.03 "intentionally withheld" the power to act via order. Accordingly, Dane County Ordinance § 46.40(1) is not preempted because the ordinance permissibly grants authority redundant to that already authorized by state statute. See Wis. Stat. § 59.03(2)(a); DeRosso Landfill, 200 Wis. 2d at 651.

¶25 As for the enforcement authority, Plaintiffs cite three state laws that touch on enforcement of public health measures. The first state law is a catchall penalty provision that makes the willful violation or obstruction of a "departmental [DHS] order" relating to public health punishable by "imprison[ment] for not more than 30 days" or a "fine[] not more than $500 or both." See Wis. Stat. § 252.25. This provision contains no express withdrawal of municipal authority. Moreover, an ordinance allowing civil citations for violations of local health orders presents no logical conflict with DHS's public health orders also carrying penalties. Finally, the fact that Wis. Stat. § 252.25 creates a strong enforcement mechanism for public health orders confirms that Dane County Ordinance § 46.40(2)'s civil penalties are entirely in line with the purpose and spirit of the state's public health laws.

¶26 The second law regarding enforcement that Plaintiffs rely on requires a local health officer to "[e]nforce state public health statutes and rules," "any regulations" adopted by the local board of health, and "any ordinances" enacted by the relevant local government. Wis. Stat. § 251.06(3). This

17

statutory list of a local health officer's mandatory enforcement duties tell us little about a county's authority to permit its health department to enforce public health orders by civil citation. It certainly does not expressly withdraw that authority. Nor do Plaintiffs identify how the enforcement of local public health orders would conflict with the duty to similarly enforce state statutes and rules as well as local regulations and ordinances. Again, the fact that state law recognizes a local health officer's duty to secure public health via enforcement measures indicates that the enforcement mechanism supplied by Dane County Ordinance § 46.40(2) comports with our state public health laws' purpose and spirit.

¶27 Finally, Plaintiffs contend Dane County Ordinance § 46.40(2) exceeds the County's statutory authority under Wis. Stat. § 66.0113. Section 66.0113(1)(a) permits a county to adopt an ordinance that authorizes the issuance of civil citations for "violations of ordinances, including ordinances for which a statutory counterpart exists." According to Plaintiffs, Dane County Ordinance § 46.40(2) authorizes citations for violations not of an ordinance but of a public health order, contrary to Wis. Stat. § 66.0113(1)(a).

¶28 We disagree. Dane County Ordinance § 46.40(2) says that refusal to obey a local public health order is "a violation of this chapter," meaning Chapter 46 of the Dane County Ordinances. See also Dane County Ordinance § 46.25(1) (making it "a violation of this chapter" to "neglect to obey any lawful order" of the Health Department). Any order issued pursuant to

18

Dane County Ordinance § 46.40 is legally rooted in that ordinance's grant of authority. Accordingly, disobeying the order is a violation of the underlying ordinance. As a result, Dane County Ordinance § 46.40(2) operates consistently with the County's authority under Wis. Stat. § 66.0113(1)(a). There is, therefore, no conflict——express, implicit, logically, or otherwise——between Dane County Ordinance § 46.40 and any state law. See DeRosso Landfill, 200 Wis. 2d at 651-52.

C. Constitutional Separation of Powers

¶29 Finally, we turn to whether a local health officer's authority to issue public health orders under Wis. Stat. § 252.03——either by itself or in tandem with the enforcement mechanism supplied by Dane County Ordinance § 46.40(2)——is an unconstitutional delegation of legislative power. Before reaching that question, though, Plaintiffs ask that we revisit our jurisprudence on the constitutional bounds of permissible legislative grants of authority. We therefore begin by addressing the proper framework in which to assess a legislative grant of power to local officials and then apply that framework to Wis. Stat. § 252.03 and Dane County Ordinance § 46.40.

¶30 Article IV, Section 1 of the Wisconsin Constitution declares that the "legislative power shall be vested in a senate and assembly." This court has never interpreted these words in a literal sense to bar the delegation of any legislative power outside the senate and assembly. See Klisurich v. DHSS, 98 Wis. 2d 274, 279, 296 N.W.2d 742 (1980) ("The Wisconsin Constitution does not require that the legislative power be

19

exclusively vested in a bicameral legislature."). Still, we have inferred from our constitution's tripartite structure that none of the three governmental powers——executive, legislative, or judicial——can be entirely delegated away from the branch to which the constitution vests it. See In re Constitutionality of § 251.18, Wis. Statutes, 204 Wis. 501, 503, 236 N.W. 717 (1931) ("[N]o one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch.").

¶31 In determining whether a legislative grant of authority transgresses this inferred constitutional limitation, our cases examine both the substantive nature of the granted power and the adequacy of attending procedural safeguards against arbitrary exercise of that power. See Klisurich, 98 Wis. 2d at 279-80. So long as the legislative grant contains an "ascertainable" purpose and "procedural safeguards" exist to ensure conformity with that legislative purpose, the grant of authority is constitutional. Id. at 280. The greater the procedural safeguards, the less critical we are toward the substantive nature of the granted power. See Panzer v. Doyle, 2004 WI 52, ¶55, 271 Wis. 2d 295, 680 N.W.2d 666, abrogated in other respects by Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408.

¶32 Plaintiffs suggest our current jurisprudence regarding the delegation of legislative authority has lost touch with the original understanding of the constitution's separation of powers. Plaintiffs advocate greater emphasis on the substantive

20

nature of the authority granted, regardless of the procedural safeguards present. They argue that the grant of power to formulate generally applicable rules of private conduct is constitutional only if the legislature has "laid down the fundamentals of the law," leaving the recipient of the power to merely "fill up the details." See State v. Whitman, 196 Wis. 472, 505-06, 220 N.W. 929 (1928). Accordingly, they invite us to overrule our precedent in favor of their proffered interpretation of the constitution.

¶33 We decline Plaintiffs' invitation. This case presents the wrong vehicle to revisit our separation-of-powers jurisprudence. As an initial matter, the principles regarding state-level delegations differ from the principles regarding local delegations. After all, the constitution defines the state legislature's relationship with the other two state-level branches differently than both the state legislature's relationship to local governments and a local legislative body's relationship with its local executive and judicial counterparts. Case in point, the state legislature constitutionally may——and does——delegate to local municipalities complete legislative authority over local affairs, subject only to the constitution and preemptive state statutes.[9] Consequently, the constitution

---

[9] See, e.g., Wis. Const. art. IV, § 22 (permitting the state legislature to delegate to county boards "powers of a local, legislative and administrative character" (emphasis added)); Wis. Const. art. IV, § 23; Wis. Const. art. XI, § 3(1); Wis. Stat. § 59.03(2) (vesting county boards "with all powers of a local, legislative and administrative character" (emphasis added)).

applies differently with respect to state-level delegations than to local delegations.

¶34 That said, we need not define what those different principles are here.  That is because both Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 would pass constitutional muster even if we assume that:  (1) state-level principles apply to local governments; and (2) Plaintiffs' proposed analysis emphasizing the substantive nature of the granted authority was the correct framework.  Applying, then, Plaintiffs' proposed analysis, Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 are sufficient in terms of both their substantive nature and their procedural safeguards, and we address each in turn.

### 1.  Substantive Nature

¶35 We begin by assessing whether the laws at issue contain an ascertainable purpose.  As is often the case with legal interpretation, context can provide even seemingly broad enabling language meaningful content.  See Legue, 357 Wis. 2d 250, ¶61 & n.30; see also Am. Power & Light Co. v. Sec. & Exch. Comm'n, 329 U.S. 90, 104 (1946) (explaining that enabling language derives "much meaningful content" from its "factual background and the [legal] context in which [it] appear[s]").  That is certainly true for Wis. Stat. § 252.03 and Dane County Ordinance § 46.40.

¶36 Importantly, these provisions "la[y] down the fundamentals of the law"——the who, what, when, where, why, and how.  See Whitman, 196 Wis. at 505-06.  The who is the local health officer.  The what is the power to "take all measures

22

necessary," to "do what is reasonable and necessary," and to "forbid public gatherings." The when is "upon the appearance of any communicable disease." The where is within the local health officer's "territory" or "jurisdiction." The why is "to prevent, suppress and control communicable disease," "the prevention and suppression of disease," or "to control outbreaks or epidemics." And the how is via actions including orders. See supra, ¶22. Moreover, each law appears in its respective code's public health chapter.

¶37 These textual limitations, read in their public health context, establish an ascertainable "general policy": disrupt the transmission pathways of contagious diseases. See Olson v. State Conservation Comm'n, 235 Wis. 473, 482, 293 N.W. 262 (1940). These textual limitations also substantively restrict a local health officer's pursuit of that general policy, allowing only public health measures reasonable and necessary to hinder the particular disease's transmission. See id.; Am. Power & Light, 329 U.S. at 105. In other words, all that remains for the local health officer is to "fill up the details" with the particular public health measures that will be responsive to the unique features of the particular contagious disease. See Whitman, 196 Wis. at 505-06.

¶38 Bolstering our conclusion that the substantive nature of Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 do not upset our constitutional separation of powers is founding-era grants of similar public health authority to local governments. Wisconsin's first state legislature saw no conflict between the

23

constitution's separation of powers and the grant of broad public health authority to local governments. The first state code enacted just months after our constitution's ratification authorized local boards of health the authority to "take such measures, and make such rules and regulations, as they may deem most effectual for the preservation of the public health." Wis. Stat. ch. 26, § 2 (1849). A violation of board of health "order or regulation" constituted a criminal misdemeanor punishable by up to $100 (over $3,000 in 2022 dollars) or three months in prison. Wis. Stat. ch. 26, § 3 (1849).

¶39 We see two upshots from this original grant of public health authority to local governments. First, the original understanding of our constitution's separation of powers was that the constitution allows grants of broad public health authority to local governments substantively similar to that delineated in Wis. Stat. § 252.03. And second, our constitution's separation of powers also allows public health orders enforceable by criminal penalties that far exceed the civil citations authorized by Dane County Ordinance § 46.40.[10] As such, Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 do not substantively offend our constitution's separation of powers.

---

[10] Because Dane County Ordinance § 46.40 does not impose criminal penalties, we do not address in this case the potential tension between these historical grants of public health authority and our decision in Wisconsin Legislature v. Palm, which did not analyze this historical evidence. 2020 WI 42, ¶¶36-40, 391 Wis. 2d 497, 942 N.W.2d 900.

24

2.  Procedural Safeguards

¶40  The  procedural  safeguards  attendant  to  Wis.  Stat.
§ 252.03  and  Dane  County  Ordinance  § 46.40  are  particularly
strong.   That is because a local health officer's discretion is
subject  to  both  state  and  local  controls.    As  with  any
legislative authority, the state legislature may curb exercises
of  granted  power  it  deems  excessive  by  amending  Wis.  Stat.
§ 252.03  or  repealing  the  statute  entirely.    As  Plaintiffs
acknowledge, our state legislature can react much more quickly
to  perceived  excesses  than  the  federal  Congress,  making  this
safeguard more robust than it might be for federal legislation.
Moreover,  state  courts  may  review  an  order  issued  pursuant  to
Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 and ensure
its  measures  conform  to  the  laws'  substantive  limitations.    For
example,  the  subject  of  an  enforcement  action  could  argue  the
measure  at  issue  is  either  not  reasonable  or  not  necessary  for
preventing  the  spread  of  a  contagious  disease,  as  Wis.  Stat.
§ 252.03(2) requires.

¶41  On  top  of  those  state-level  procedural  safeguards  are
several local controls.   First, the Health Board can exert its
supervisory  and  policy-making  control  over  the  local  health
officer.   See  Wis.  Stat.  § 251.04(1)-(3).    Second,  elected
officials in both the County and the City possess the power to
remove  the  local  health  officer.    See  Wis.  Stat.
§§ 17.10 & 17.12(c); see also Wis. Stat. § 17.13(1) (removal of
village  and  town  appointive  officers).    The  removal  powers
entrusted  to  local  elected  officials  is  a  strong  procedural

25

safeguard because such officials are often more knowledgeable about and responsive to local preferences.[11]  Local officials can act decisively if a local health officer acts contrary to the preferred public health policy of the constituency.  And third, the County's board and the City's common council control the Health Department's annual budget and thus may leverage appropriations to affect a local health officer's actions.  See Wis. Stat. § 251.11.

¶42  In sum, the ascertainable purpose evident in both Wis. Stat. § 252.03 and Dane County Ordinance § 46.40's text and surrounding context, the history of substantively similar grants dating back to Wisconsin's first legislative code, and the substantial state and local procedural safeguards against arbitrary exercises of a local health officer's granted authority all lead us to conclude Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 constitute constitutional grants of authority.

*** 

¶43 Before concluding, we stress three critical points. First, our holding addresses only a public health officer's authority to issue public health orders; the validity of specific measures appearing in those orders is not before us. Second, nothing in this opinion should be read as departing from our existing precedent on separation-of-power principles.  It

---

[11] See Lawrence Rosenthal, Romer v. Evans As the Transformation of Local Government Law, 31 Urb. Law. 257, 274-75 (1999).

26

remains the law that courts must review "the nature of delegated power and the presence of adequate procedural safeguards, giving less emphasis to the former when the latter is present," Panzer, 271 Wis. 2d 295, ¶55, and we break no new ground regarding the limitations on delegations to or within local governments.

¶44 Finally, and most importantly, the dissent's resort to disparaging a public servant——who has no opportunity to defend herself——is a poor substitute for legal argument. Such personal aspersions have no place in a judicial opinion. While the direct and implied contentions that a local health official is a tyrant, an autocrat, a dictator, and a despot are fantastical, they do real damage to the public's perception of this court's work. We must aspire to be better models of respectful dialogue to preserve the public's confidence on which this court's legitimacy relies.

### III. CONCLUSION

¶45 Wisconsin Stat. § 252.03 grants local health officers the authority to issue public health orders. Dane County Ordinance § 46.40, which makes such orders enforceable by civil citations, is not preempted by state law. And neither laws' grant of authority runs afoul of our constitution's separation of powers. Accordingly, we affirm the circuit court's grant of summary judgment in favor of the defendants. Though this resolves all of Becker and Klein's claims, the Health Department's counterclaims against A Leap Above remain pending. Therefore, we remand back to the circuit court to resolve the remaining counterclaims.

27

*By the Court.*—The order of the circuit court is affirmed, and the cause remanded for further proceedings consistent with this opinion.

¶46 BRIAN HAGEDORN, J. *(concurring).* In response to the COVID-19 pandemic, some local health officers, including Dane County's Janel Heinrich, issued various orders to combat the spread of COVID-19. The petitioners in this case do not challenge the legality of any specific order Heinrich issued. Such orders can be challenged on statutory or constitutional grounds; indeed, we previously concluded one order Heinrich issued was partially invalid for both statutory and constitutional reasons.[1] Rather, this case presents a challenge to local health officers' ability to issue any orders——without care for any particular order's content or effect. The arguments the petitioners bring apply equally to orders issued during the present pandemic, as well as to future health scares large and small. So while litigants could raise challenges to specific orders issued during the COVID-19 pandemic, today's case does not.

¶47 The majority/lead opinion aptly addresses the petitioners' statutory arguments.[2] I write separately to discuss the petitioners' request that we revisit our precedents and revitalize a more robust, judicially-enforced nondelegation doctrine at both the state and local levels. Rooted in our constitution's separation of powers, the basic idea behind the nondelegation doctrine is that the assignment of distinct powers into separate branches——legislative, executive, and judicial——

---

[1] See James v. Heinrich, 2021 WI 58, 397 Wis. 2d 517, 960 N.W.2d 350.

[2] I join ¶¶1-28 and 44-45 of the majority/lead opinion.

means the branch of government assigned certain powers may not delegate its core powers to another.[3] This case asks whether the legislature impermissibly delegated legislative power to local health officers across the state and whether the Board of Supervisors impermissibly delegated legislative power to Dane County's local health officer.

¶48 Properly analyzing these claims requires a resort to first principles. When interpreting the Wisconsin Constitution, our obligation is to discern the meaning of the words adopted by the people and faithfully apply them to the facts before us.[4] The constitution is a written document with terms that had specific meaning when adopted. The Wisconsin Constitution "means what it says, not what federal cases say, and not what we might want it to say."[5] Faithful constitutional interpretation requires that "we focus on the language of the adopted text" as that language was originally understood.[6] Part of this analysis may require resort to "historical evidence including 'the practices at the time the constitution was adopted, debates over adoption of a given provision, and early legislative

---

[3] Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶31-35, 393 Wis. 2d 38, 946 N.W.2d 35.

[4] State v. Halverson, 2021 WI 7, ¶22, 395 Wis. 2d 385, 953 N.W.2d 847; James, 397 Wis. 2d 517, ¶61 (Hagedorn, J., concurring).

[5] James, 397 Wis. 2d 517, ¶61 (Hagedorn, J., concurring).

[6] Halverson, 395 Wis. 2d 385, ¶22; see also James, 397 Wis. 2d 517, ¶62 (Hagedorn, J., concurring).

interpretation as evidenced by the first laws passed following the adoption.'"[7]

¶49 Unfortunately, however, the petitioners in this case do not offer this type of evidence or analysis. Instead, they largely recite general theories of government power and selective quotes from federal and state cases. Certainly Montesquieu and Madison inform the meaning of Wisconsin's constitution, but they cannot serve as substitutes for a faithful originalist analysis of our constitution's text and history. They are helpful, but not sufficient. Where we are asked to disavow nearly 100 years of precedent and institute something new, an honest examination of the original understanding of the Wisconsin Constitution is never more necessary.

¶50 The constitutional claims raised by the petitioners do not succeed because the historical evidence weighs against the petitioners' arguments under the unique facts of this case. Alternative evidence of the original understanding may exist for this type of claim, but if it does, the petitioners have failed to present it. I remain open to more broadly reconsidering our approach to the nondelegation doctrine in future cases. But we should begin with a careful analysis of the original understanding of the Wisconsin Constitution. As it does here, a text-and-history inquiry may resolve many nondelegation claims without resort to a judicially-designed implementing doctrine.

---

[7] Halverson, 395 Wis. 2d 385, ¶22 (quoting Vos, 393 Wis. 2d 38, ¶28 n.10).

## I. LEGAL PRINCIPLES

¶51 Before discussing the merits of the petitioners' nondelegation claims, we must first address the legal principles and methodology that guide our analysis of such challenges.

¶52 Like the federal Constitution, our state constitution separates government power into three branches: legislative, executive, and judicial.[8] Then it "vests" discrete powers in each corresponding branch——legislative power, executive power, and judicial power.[9] Although these powers overlap to a limited extent, they are in most respects separate and distinct from one another.[10] Accordingly, since the constitution says the legislature is vested with legislative power, the inference is that core legislative power may not be placed elsewhere, by the legislature or otherwise.[11] The same goes for the other branches of government. This principle is easy enough to understand in concept, but it is far more difficult to apply in practice.

¶53 For nearly 100 years, this court has mostly taken a hands-off approach to claims of impermissible delegation of legislative power.[12] We have upheld laws that assign

---

[8] Vos, 393 Wis. 2d 38, ¶31.

[9] Wis. Const. art. IV, § 1; id. art. V, § 1; id. art. VII, § 2; see also Vos, 393 Wis. 2d 38, ¶31.

[10] Vos, 393 Wis. 2d 38, ¶¶32-34.

[11] In re Constitutionality of Section 251.18, Wis. Statutes, 204 Wis. 501, 503, 236 N.W. 717 (1931).

[12] State ex rel. Wis. Inspection Bureau v. Whitman, 196 Wis. 472, 504-06, 220 N.W. 929 (1928); Watchmaking Examining Bd. v. Husar, 49 Wis. 2d 526, 533-34, 182 N.W.2d 257 (1971); Westring v. James, 71 Wis. 2d 462, 468, 238 N.W.2d 695 (1976).

4

policymaking to executive bodies based primarily on whether the law contains sufficient procedural protections to curb abuses of delegated power.[13] While not without some substantive limits, we have generally looked the other way if procedural protections "will adequately assure that discretionary power is not exercised unnecessarily or indiscriminately."[14]

¶54 This has not always been our practice.[15] Between 1896 and 1927, we were more exacting regarding the substance of delegated authority.[16] During that time, we said certain policy decisions could not be farmed out to the executive branch. Although agencies could be left to fill up rather technical details, the overall policy choices needed to come directly from

---

[13] *Panzer v. Doyle*, 2004 WI 52, ¶55, 271 Wis. 2d 295, 680 N.W.2d 666, *abrogated on other grounds by* *Dairyland Greyhound Park, Inc. v. Doyle*, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408.

[14] *Id.* (noting that the nondelegation doctrine "is now primarily concerned with the presence of procedural safeguards"); *id.*, ¶79 n.29 (but observing that "there may be certain powers that are so fundamentally 'legislative' that the legislature may never transfer those powers to another branch of government").

[15] *See generally* Joseph A. Ranney, *Trusting Nothing to Providence: A History of Wisconsin's Legal System* 377-88 (1999) (surveying the development of the nondelegation doctrine in Wisconsin).

[16] *See* *Dowling v. Lancashire Ins. Co.*, 92 Wis. 63, 70-72, 65 N.W.2d 738 (1896); *State ex rel. Adams v. Burdge*, 95 Wis. 390, 401-04, 70 N.W. 347 (1897); *see also* Joseph A. Ranney, *Wisconsin and the Shaping of American Law* 82 (2017) (explaining that the court took a "new tack" in *Dowling* and *Adams*). *But see* *State ex rel. Baltzell v. Stewart*, 74 Wis. 620, 631-32, 43 N.W. 947 (1889) (upholding a statute that empowered a commission to create and define drainage districts in Dane County).

the legislature.[17] We closed this chapter, however, and have since declined to fastidiously police the line between permissible legislative grants of power and impermissible delegations of legislative power.[18]

¶55 The petitioners urge us to return to a more robust judicial enforcement of the nondelegation doctrine akin to our 1896-1927 decisions, asking that we articulate general principles to govern nondelegation challenges. Specifically, relying on the separate writings of two United States Supreme Court justices proposing tests under the federal Constitution,

---

[17] Burdge, 95 Wis. at 402 ("[T]here must first be some substantive provision of law to be administered and carried into effect."). Even during this era, however, state agencies were permitted some hand in state government decision-making. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. R.R. Comm'n of Wis., 136 Wis. 146, 116 N.W. 905 (1908) (upholding a law that directed the Railroad Commission to set railroad rates); State ex rel. Buell v. Frear, 146 Wis. 291, 306, 131 N.W. 832 (1911) (upholding a civil service law on the grounds that it simply directed the agency to "ascertain the facts and to apply the rules of law thereto under the prescribed terms and conditions"); State v. Lange Canning Co., 164 Wis. 228, 241, 160 N.W. 57 (1916) (upholding a labor law that directed the Industrial Commission to determine "what class or classes of employment are dangerous or prejudicial to the life, health, safety, or welfare of females" and regulate "the time which females may labor therein").

[18] See Whitman, 196 Wis. at 505-06. Yet, it has not been unfettered deference. We have continued to strike down laws that delegate too much authority to executive officials. E.g., Gibson Auto Co. v. Finnegan, 217 Wis. 401, 407, 259 N.W. 420 (1935) (striking down a depression era recovery act that authorized the governor to establish fair competition codes, noting it was "difficult to conceive of a more complete abdication of legislative power than is involved in this act"); State ex rel. Zimmerman v. Dammann, 229 Wis. 570, 575-76, 283 N.W. 52 (1938) (striking down a law that delegated to an emergency board the power to appropriate money).

they advance a two-question framework that asks (1) whether the delegated power involves "the formulation of generally applicable rules of private conduct,"[19] and (2) whether the executive branch, rather than the legislature, is left to make policy judgments.[20] The petitioners also urge us to maintain the current requirement for procedural safeguards.

¶56 The major difficulty with the petitioners' plea is they make little effort to ground either their claims or their proposed framework in the original understanding of the Wisconsin Constitution. Instead, they point to language in our 1896-1927 cases and offer theories about nondelegation under the federal Constitution. But an originalist analysis of the Wisconsin Constitution requires examining how the nondelegation doctrine was understood in 1848 when our constitution was ratified.[21]

¶57 The petitioners' effort to compose a new, broadly applicable legal test misses the key point in the analysis. We must begin with constitutional text and history, and measure any proposed test against that. "A proper legal test must implement and effectuate" the original understanding of the law; that is, it "must be a faithful extension of the lines ascertainable in

---

[19] See Dep't of Transp. v. Ass'n of Am. R.R.s, 575 U.S. 43, 70 (2015) (Thomas, J., concurring); see also Gundy v. United States, 139 S. Ct. 2116, 2133 (Gorsuch, J., dissenting).

[20] See Gundy, 139 S. Ct. at 2136, 2141 (Gorsuch, J., dissenting).

[21] James, 397 Wis. 2d 517, ¶62 (Hagedorn, J., concurring).

the provision's text and history."[22] In that light, the questions proposed by petitioners are less helpful to this nascent inquiry into the how the separation of powers should be enforced by the judiciary today. A better approach is first to examine the allegedly improper delegation based on what the text and history reveal.[23]

## II. APPLICATION

¶58 The petitioners in this case offer two distinct nondelegation claims. First, they contend that Wis. Stat. § 252.03 impermissibly delegates legislative power to local health officers. Second, the petitioners assert that Dane County Ordinance § 46.40(2) unlawfully transfers local

---

[22] State v. Roundtree, 2021 WI 1, ¶116, 395 Wis. 2d 94, 952 N.W.2d 765 (Hagedorn, J., dissenting).

[23] The United States Supreme Court recently endorsed a similar approach in two federal constitutional contexts. The proper analytical framework for Second Amendment questions has lingered in lower courts for over a decade. The Court has now answered that question, at least preliminarily. It articulated a test that "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, ___ S. Ct. ___, 2022 WL 2251305, at *12 (2022). The Court explicitly rejected a generally applicable tiers of scrutiny framework. Id. at *9. Similarly, the Court recently instructed the "that the Establishment Clause must be interpreted by reference to historical practices and understandings." Kennedy v. Bremerton Sch. Dist., ___ S. Ct. ___, 2022 WL 2295034, at *3 (2022) (internal quotation marks omitted). These cases are instructive of the type of analysis that can inform the meaning of the Wisconsin Constitution as well.

legislative authority to Dane County's local health officer. Both claims fall short, though for different reasons.

### A. Wisconsin Stat. § 252.03

¶59 In the challenged statute, the legislature directs local health officers to "take all measures necessary to prevent, suppress and control communicable diseases" and instructs that they "may do what is reasonable and necessary for the prevention and suppression of disease," including forbidding public gatherings.[24] The petitioners contend that in enacting this law, the legislature violated the constitution by impermissibly delegating legislative power to local health officers.

¶60 This claim rests upon the constitutional vesting of legislative power "in a senate and assembly."[25] While this textual grant informs our analysis, we must conduct a historical inquiry to determine how this was understood in practice, keeping our eye out for on-point historical analogues.

¶61 We applied this approach recently in State ex rel. Kaul v. Prehn.[26] There, we analyzed the available historical evidence to determine whether the original understanding of the Wisconsin Constitution conferred broad removal powers on the governor.[27] Looking to the historical record, we rejected the

---

[24] Wis. Stat. § 252.03(1) & (2).

[25] Wis. Const. art. IV, § 1.

[26] 2022 WI 50, ¶42-51, ___ Wis. 2d ___, ___ N.W.2d ___.

[27] Id.

attorney general's argument, rooted in political theory and federal law, that this sort of control over appointment and removal was a core executive power.[28] Instead, our research revealed that the original understanding of the removal power in Wisconsin was different, and suggested that the legislature was understood to have more of these powers under Wisconsin's constitutional design.[29] That form of analysis——looking to history to illuminate the understanding of imprecise constitutional text——is appropriate in this case as well.

¶62 Our earliest statutes provide particularly important evidence of how the Wisconsin Constitution was originally understood.[30] The Revised Statutes of 1849 were written and adopted by legislators who observed or participated in the constitutional convention first hand.[31] Shortly after it convened, Wisconsin's first state legislature quickly created a commission to assist in drafting our first statutes.[32] The commission's task was to compile and recommend an initial set of laws based upon territorial rules and practice, omitting those

---

[28] Id., ¶¶43, 44-50.

[29] Id., ¶45.

[30] See Vos, 393 Wis. 2d 38, ¶64 ("Early enactments following the adoption of the constitution are appropriately given special weight."); see also NLRB v. Canning, 573 U.S. 513, 572 (2014) (Scalia, J., concurring) ("Of course, where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision.").

[31] See Ranney, supra n.17, at 76.

[32] Id.

10

that were obsolete, as well as those repugnant to the newly drafted constitution.[33] The commission's recommendations were then debated and voted on by the legislature, ultimately creating the Revised Statutes of 1849.[34]

¶63 These laws therefore have unique relevance to an analysis focused on the original understanding of the constitutional text.[35] This is particularly true when we find laws on the books today that either descended from these early statutes or do similar things. When the constitutionality of such a law is challenged, the historical context provided by those early laws must weigh heavily in the analysis. Does this mean these 1849 laws represent the final word on a statute's constitutionality? No. But unquestionably, they provide very strong evidence of the constitution's original understanding.[36]

---

[33] Id.

[34] Id. at 76-77.

[35] State v. Beno, 116 Wis. 2d 122, 138, 341 N.W.2d 668 (1984) ("[B]ecause the Revised Statutes of 1849 are the first of our statutes to be enacted following the constitution, it is reasonable to rely on those statutes as reflecting the practice when the constitution was adopted to assist our interpretation of a word used by the authors of the constitution in 1848." (quoting another source)).

[36] We have long employed this interpretive technique in constitution interpretation. See State ex rel. Pluntz v. Johnson, 176 Wis. 107, 114-15, 186 N.W. 729 (1922) (noting that a statute "first appeared in the . . . Revised Statutes of 1849" and concluding that it "amounts to contemporaneous legislative construction of this constitutional provision, which construction is entitled to great deference"); Payne v. City of Racine, 217 Wis. 550, 558, 259 N.W. 437 (1935) (same); Buse v. Smith, 74 Wis. 2d 550, 572, 247 N.W.2d 141 (1976) (noting the persuasive force of "the contemporaneous construction evidenced" a provision of the "Revised statutes of 1849").

11

¶64 One such 1849 statute is especially on-point in this case. Chapter 26 in the Revised Statutes of 1849 was entitled "Of the Preservation of the Public Health."[37] That statute is significant for our purposes because it established local boards of health and gave them duties and responsibilities quite similar to the statutes challenged in this case.[38] In relevant part, the statute provided: "Every board of health may take such measures, and make such rules and regulations, as they may deem most effectual for the preservation of the public health."[39] It then provided that "every person who shall violate any order or regulation, made by any board of health . . . shall be deemed guilty of a misdemeanor, and punished by a fine not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months."[40] In other words, not only did Wisconsin's first state government authorize local health authorities to issue orders, it criminalized the failure to follow those orders.

¶65 These 1849 statutes offer significant evidence of original understanding in this case. When the Wisconsin Constitution was ratified, those participating in state government did not appear to understand the constitution to forbid giving local officials charged with protecting public

---

[37] Wis. Stat. ch. 26 (1849).

[38] Id.

[39] Wis. Stat. ch. 26, § 2 (1849).

[40] Wis. Stat. ch. 26, § 3 (1849).

12

health the authority to issue at least some orders of indeterminate character. Nor was it understood to be problematic if those orders were enforceable. That same general statutory authority has been amended and modified many times, but it continues in today's Wis. Stat. § 252.03.[41] If this arrangement on its face did not run afoul of the constitutional separation of powers in 1849, it is hard to see why it would today. Whatever theoretical nondelegation framework may be found in the Wisconsin Constitution, this kind of empowerment of local health officials does not appear to violate it.

¶66 I stress that this conclusion does not mean that orders issued by local health officers are immune from challenge. In State ex rel. Adams v. Burdge, for example, following a challenge by an affected parent, this court struck down a rule adopted by the state board of health mandating smallpox vaccines as a condition of attending school.[42] The court found this to be in conflict with the law mandating school attendance, and explained that permitting the state board of health to adopt this type of rule would be an impermissible delegation of legislative power.[43] The court further concluded the rule would be "void as unreasonable and unnecessary,"

---

[41] See Wis. Stat. ch. 26, §§ 2, 3 (1849); Wis. Stat. ch. 32 §§ 2, 3 (1858); Wis. Stat. ch. 57, §§ 1412, 1413 (1878); Wis. Stat. ch. 76e § 1412 (1921); Wis. Stat. § 143.03 (1923-24); Wis. Stat. § 252.03 (1993-94).

[42] 95 Wis. 390; see also James, 397 Wis. 2d 517.

[43] Burdge, 95 Wis. at 399-404.

calling it "a sweeping and far-reaching exercise of the power."[44] But <u>Burdge</u> itself affirmed that the legislature <u>could</u> authorize health officials to issue orders in some circumstances:

> It cannot be doubted but that, under appropriate general provisions of law in relation to the prevention and suppression of dangerous and contagious diseases, authority may be conferred by the legislature upon the state board of health or local boards to make reasonable rules and regulations for carrying into effect such general provisions, which will be valid, and may be enforced accordingly.[[45]]

Unlike in <u>Burdge</u>, the question in this case is not whether a particular order was out of bounds, but whether the statute may authorize public health orders at all. Justice Pinney's opinion in <u>Burdge</u> supports the conclusion that the authority to issue local health orders may be conferred by the legislature on local health officials, but specific orders may be challenged on constitutional grounds or on the basis that they are not reasonable and necessary, among other claims.[46]

¶67 Perhaps historical evidence specific to the Wisconsin Constitution weighs the other way, but it has not been presented to us nor has my research uncovered it. My conclusion is based

---

[44] <u>Id.</u> at 405.

[45] <u>Id.</u> at 401.

[46] The dissent misses this point in our cases and misunderstands the claim before us. It spends considerable time criticizing the fines levied against A Leap Above Dance, LLC; the decision to classify a dance class as a high risk sport; the multiple orders it describes as "oppressive"; and the banning of gatherings in private homes before Thanksgiving. But again, whether those particular choices were unlawful or unconstitutional is not before this court; the petitioners challenged only whether any orders can be issued at all.

14

on the historical evidence available to me and the unique claims before us.[47] And because this claim can be resolved on the basis of this historical evidence, it is unnecessary at this time to adopt a new nondelegation framework to analyze future claims.

### B. Dane County Ordinance § 46.40(2)

¶68 The petitioners' second nondelegation claim is different. They contend Dane County Ordinance § 46.40(2) unlawfully delegates local legislative power vested in the county board to the local health officer. The challenged ordinance provides: "It shall be a violation of this chapter to refuse to obey an Order of the Director of Public Health Madison and Dane County entered to prevent, suppress or control communicable disease pursuant to Wis. Stat. [§] 252.03."[48] The penalty for noncompliance is a forfeiture "not less than $50 nor more than $200 for each day that a violation exists."[49] Refusal to pay the forfeiture, when one has the ability to pay, may result in confinement not to exceed 30 days.[50]

¶69 The dissent contains a thorough overview of the cases interpreting Article IV, Section 22 of the Wisconsin Constitution, on which the petitioners' claim is based. But we

---

[47] Prehn, ___ Wis. 2d ___, ¶44 (explaining that it falls to the parties to "construct a historical record in support of" their constitutional claims).

[48] Dane County Ordinance § 46.40(2).

[49] Dane County Ordinance § 46.27(1).

[50] Dane County Ordinance § 46.27(3).

15

need not analyze that provision because Dane County Ordinance § 46.40(2) does not even trigger it. The ordinance is limited. It penalizes those who refuse to obey an order issued "pursuant to Wis. Stat. [§] 252.03." The authority to issue an order punishable under this ordinance is therefore confined to the powers conferred by § 252.03. The ordinance on its face simply does not give the county's legislative power to the local health officer; it does not independently authorize local health officers to issue orders at all. The legislature——not the county board——granted that power to local health officers in § 252.03, which is all the ordinance appeals to. The ordinance makes it a violation subject to penalty to disobey a lawful order authorized by § 252.03.[51] Just as the legislature can, and does, penalize the violation of lawful public health orders,[52] I see no reason why a duly enacted county ordinance making it a violation to disobey lawful local public health orders would be considered an impermissible delegation of power.

¶70 The petitioners offer no meaningful counterargument for this understanding of what the ordinance does, asserting only that if the power to issue orders comes from Wis. Stat. § 252.03 rather than the ordinance, "it just means the nondelegation problem lies in § 252.03." But as we have explained, § 252.03 does authorize local health officers to issue orders, and it does not violate the nondelegation doctrine. Nothing in the text of Dane County Ordinance

---

[51] See also Wis. Stat. § 66.0113.

[52] See Wis. Stat. § 252.25.

16

§ 46.40(2) suggests it separately authorizes local health orders. Without that, there is no plausible delegation of legislative power to evaluate.

### III. CONCLUSION

¶71 The petitioners bring us two nondelegation claims supported by a proposal for how we should analyze nondelegation questions going forward. I do not endorse a broader nondelegation framework at this time because doing so is unnecessary to resolve the claims before us. Based on the historical record, I conclude the legislature did not impermissibly delegate legislative power to local health officers by authorizing them to issue orders under Wis. Stat. § 252.03. I also conclude the petitioners' claim that Dane County Ordinance § 46.40(2) violates local nondelegation principles fails because the ordinance does not delegate, or redelegate as the dissent frames it, legislative power at all.

¶72 I close with a word to litigants. Regardless of judicial philosophy, every member of this court is interested in what the text says and what the historical evidence reveals about the text.[53] Therefore, parties who come to us advancing legal theories grounded in the Wisconsin Constitution should make every effort to present arguments focused on the original understanding of our constitution.[54] While such briefing is

---

[53] See majority/lead op., ¶¶38-39 (relying on historical evidence from Wisconsin's founding era).

[54] See Halverson, 395 Wis. 2d 385, ¶¶22, 24.

17

always welcome, arguments of this type are especially helpful when analyzing novel claims or considering challenges to our precedent. This is not a new invitation; it is made in earnest.[55]

---

[55] James, 397 Wis. 2d 517, ¶62 (Hagedorn, J., concurring).

¶73  REBECCA GRASSL BRADLEY, J.  *(dissenting).*

"'Law is the ultimate science,'" Paul quoted.  "Thus it reads above the Emperor's door.  I propose to show him law."

Frank Herbert, <u>Dune</u> 284 (Penguin Books 2016) (1965).

¶74 Our republic and our state were founded on the fundamental idea that the people possess inherent rights, they form governments for the primary purpose of protecting those rights, and governments may exercise only those powers the people consent to give them.[1]  Under our state constitution, the people of Wisconsin authorized particular elected officials to exercise power over them.  But the people never consented to that power being given away.

¶75 This case involves the power to make the rules by which the people will be bound, a power the people have entrusted to state and local legislatures alone.  Not surprisingly, when the people consented to submitting to the rules that will govern society, they carefully confined the exercise of such awesome power to those whom they elect.  Should others attempt to rule over the people, their actions are beyond the law, even if they bear the imprimatur of a legislative body.  Legislators have no power to anoint legislators; only the people do.

---

[1] Echoing the Declaration of Independence, the people of Wisconsin enshrined these first principles in the first section of the first article of our state constitution:  "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const. art. I, § 1.

1

The legislative cannot transfer the power of making laws to any other hands: for it being but a delegated power from the people, they who have it cannot pass it over to others. . . . And when the people have said, We will submit to rules, and be governed by laws made by such men, and in such forms, no body else can say other men shall make laws for them; nor can the people be bound by any laws, but such as are enacted by those whom they have chosen, and authorized to make laws for them. The power of the legislative, being derived from the people by a positive voluntary grant and institution, can be no other than what that positive grant conveyed, which being only to make laws, and not to make legislators, the legislative can have no power to transfer their authority of making laws, and place it in other hands.

. . . .

The legislative neither must nor can transfer the power of making laws to any body else, or place it any where, but where the people have.

John Locke, Second Treatise of Government §§ 141–42 (C.B. McPherson ed. 1980) (1690).

¶76 The majority misunderstands first principles and ignores the plaintiffs' principal and most persuasive argument. In Article IV, Section 22 of the Wisconsin Constitution, a section the majority/lead opinion[2] and the concurrence both cite but once in passing references,[3] the people of Wisconsin

---

[2] Wis. Sup. Ct. IOP III.G.5 ("If . . . the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion[.]'").

[3] The plaintiffs' main brief cites Article IV, Section 22 of the Wisconsin Constitution so many times, the table of authorities does not provide specific page numbers for each instance in which it is cited, instead using the phrase, "passim." The majority/lead opinion instead focuses on Article IV, Section 1 (which vests all legislative power in the senate and assembly). The plaintiffs' main brief cites that clause on a single page. Justice Brian Hagedorn complains the petitioners do not analyze the original meaning of this provision but he

2

authorized the state legislature to delegate certain powers to county boards. That section states, "[t]he legislature may confer upon the boards of supervisors of the several counties of the state such powers of a local, legislative and administrative character as they shall from time to time prescribe." Wis. Const. art. IV, § 22. The original public meaning of this text, as confirmed by the historical record, reflects the founders' recognition of the non-delegation principle, on which the constitutional framers' vesting of separate powers in each branch was based. Because the people decide who may create the laws that will bind them, those to whom power has been delegated may not give it away. The people adopted an exception permitting the legislature to delegate lawmaking power to county boards (the members of which are elected), but those local governmental entities may not give the power to anyone else. See infra Part II.

¶77 This court has long held the Wisconsin Constitution does not permit county boards of supervisors to subdelegate lawmaking power. Although Article IV, Section 22 authorizes the initial delegation from the legislature to the county boards, the constitution does not authorize any subdelegation. Accordingly, this court has declared unconstitutional a statute enacted by the legislature authorizing "a county board to delegate to the electors of the county a power by the Constitution expressly delegated to the county board itself."

fails to undertake the analysis at all. Discerning original meaning requires hard work but is an essential element of our job as justices.

3

See Marshall v. Dane Cnty. Bd. of Supervisors, 236 Wis. 57, 59, 294 N.W. 496 (1940). The constitution does not give the Dane County Board of Supervisors any authority to empower a single, unelected bureaucrat to restrict the liberty of the people of Dane County.[4]

¶78 Dane County Ordinance § 46.40 (Dec. 2020) violates the Wisconsin Constitution because it transfers lawmaking power delegated to the Dane County Board of Supervisors. Enforcing the non-delegation principle is vital to the maintenance of free government but the majority eviscerates it. Violating its oath to uphold the Wisconsin Constitution, the majority disturbs the people's constitutional choices of who may exercise power over them, eroding the people's fundamental freedoms. I dissent.

## I. BACKGROUND

### A. Dane County Ordinance § 46.40

¶79 The outbreak of COVID-19 spawned an unprecedented exercise of extraordinary power over the people by many governmental entities. See generally Samuel Alito, United States Supreme Court Justice, Address at the Federalist Society National Convention (Nov. 12, 2020) ("The pandemic has resulted in previously unimaginable restrictions on individual liberty."). This case concerns the actions of one particular official, Janel Heinrich, the Public Health Officer and Director of Public Health of Madison and Dane County ("PHMDC").

---

[4] As explained in Part II, a county board of supervisors can pass an ordinance that takes effect only if it is approved by a vote of the people; however, it cannot make referendum votes to pass ordinances by direct democracy binding on itself.

4

¶80 For nearly two years, Heinrich has been creating law, interpreting it, and then enforcing it against the people of Dane County. In late May 2020, the Dane County Board of Supervisors passed Dane County Ordinance § 46.40, purportedly granting Heinrich unilateral rulemaking authority effectively identical (although on a smaller geographical scale) to the very powers this court held only weeks earlier could not be lawfully exercised by a state official. See generally Wis. Legislature v. Palm, 2020 WI 42, 391 Wis. 2d 497, 942 N.W.2d 900; Wis. Cnty. Ass'n, Guidance in Implementing Regulations Surrounding Communicable Diseases 37 (2020) ("Even though the decision applied only to [the Department of Health Services ('DHS')], the Palm Court's reasoning suggests that legislative body oversight may be a prerequisite to an unelected official's (e.g., a local health officer) authority to enforce a public health order applicable to the public at large without raising significant constitutional concerns surrounding separation of powers.").

¶81 Dane County Ordinance § 46.40 provides, in relevant part:

> (1) Duty of Director, Public Health Madison and Dane County. Pursuant to Wis. Stat. ss. 252.03(1) & (2) the Director of Public Health Madison and Dane County shall promptly take all measures necessary to prevent, suppress and control communicable diseases within Dane County, including forbidding public gatherings when deemed necessary to control outbreaks or epidemics.
>
> (2) Public Health Orders. It shall be a violation of this chapter to refuse to obey an Order of the Director of Public Health Madison and Dane County entered to prevent, suppress or control

5

communicable diseases pursuant to Wis. Stat.
s. 252.03.

§ 46.40(1)-(2). A violation of an "order" issued pursuant to this ordinance exposes a person to a civil forfeiture of $50 to $200 for each day the violation exists. Dane County Ordinance § 46.27(1). If a person does not pay, the person can be jailed. § 46.27(3) ("Any person who has the ability to pay any forfeiture against him or her under this chapter but who refuses to do so may be confined in the county jail until such forfeiture is paid, but in no event to exceed thirty (30) days.").

¶82 The ordinance creates an enforcement mechanism non-existent in Wisconsin statutes. For context, Wis. Stat. § 252.25 (2019-20)[5] states:

> Any person who willfully violates or obstructs the execution of any state statute or rule, county, city or village ordinance or [DHS] order under this chapter and relating to the public health, for which no other penalty is prescribed, shall be imprisoned for not more than 30 days or fined not more than $500 or both.

While § 252.25 declares a violation of a DHS order punishable by jail and a fine, it does not provide a penalty or other enforcement mechanism for "orders" issued by local health officers. See Wis. Cnty. Ass'n, Guidance in Implementing Regulations, at 32 ("Neither the statutes nor the administrative code provide for a detailed enforcement mechanism of a local health officer's general order. It is important to understand that a local health officer's order, standing alone, may not be

---

[5] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

6

'enforced' – make a violator subject to civil forfeiture – absent a local ordinance allowing for such enforcement."). Dane County's prayer for relief effectively concedes this point, citing Dane County Ordinance § 46.27(1)——not any statute——as a justification for the fine.

¶83 The question in this case is not whether any statute has delegated lawmaking power to Heinrich (lawfully or otherwise) but whether the county ordinance has lawfully delegated this power to her. See Dane County Ordinance § 46.40(2) ("It shall be a violation of this chapter . . . ."). Because the county board empowered Heinrich to define what constitutes a violation of the ordinance, and only a violation of the ordinance can trigger a penalty, the issue in this case does not rest on any statute purporting to directly grant her authority. To the extent the majority suggests otherwise, it misdirects the analysis.

B. Heinrich's Tyranny

¶84 Heinrich has exercised dictatorial powers for nearly two years, in contrast with her peers in other counties.[6] In this very case, Dane County fully admits Heinrich issued an

---

[6] Dane County's COVID-19 response is atypical. According to the complaint, "[o]nly three counties that plaintiffs are aware of (Dane, Door, and Pierce) have adopted ordinances preemptively making any order of the local health officer enforceable without limits or oversight by the county board." Additionally, "only Dane County's local health officer has issued orders in reliance on such an ordinance, that Plaintiffs are aware of." The majority insinuates the mandates imposed by Heinrich's orders were necessary, but the COVID-19 response by the remaining 71 counties in the state belies the majority's misperception of reality. See Majority/lead op., ¶4.

7

"emergency order." PHMDC then posted "guidance" on its website explaining how Heinrich defined certain key terms in that order. PHMDC later filed an enforcement action against A Leap Above Dance, LLC ("Dance Studio") seeking nearly $24,000 in fines.[7]

¶85 According to Dane County, around Christmas 2020 (nearly a year after the outbreak of COVID-19), the Dance Studio held a performance of the Nutcracker ballet. Dane County mislabeled this performance a "high risk sport" as defined on its webpage——not in Heinrich's order.[8] For the apparent purpose of maximizing penalties, it declared that each of the eight segments of the ballet constituted a different event. The Dance Studio pointed out that the order's terms permitted "unregulated youth programs," an undefined phrase in the order. In its Orwellian doublethink,[9] Dane County absurdly says ballet is a sport and not a youth program.

¶86 After the Dance Studio joined this lawsuit, PHMDC dismissed the enforcement action and filed two counterclaims in

---

[7] Although Dane County uses the term civil forfeiture, a $24,000 penalty could cripple a small business.

[8] Shockingly, Dane County's second counterclaim begins, "[g]roup dance was classified as a COVID-19 high risk sport in Sports Guidance issued by the PHMDC[.]"

[9] "To know and not to know, to be conscious of complete truthfulness while telling carefully constructed lies, to hold simultaneously two opinions which cancelled out, knowing them to be contradictory and believing in both of them, to use logic against logic, to repudiate morality while laying claim to it, to believe that democracy was impossible and that the Party was the guardian of democracy . . . . Even to understand the word 'doublethink' involved the use of doublethink." George Orwell, Nineteen Eight-Four 36 (Plume | Harcourt Brace Book 2003) (1949).

this case. Although Dane County now seeks less than $24,000, it still alleges sixteen separate violations——eight for each counterclaim——for a single ballet performance. Specifically, Dane County asserts the Dance Studio committed eight separate violations of the "mass gathering" prohibition declared in Heinrich's emergency order. In a second counterclaim, Dane County asserts eight separate violations of a "physical distancing" mandate declared in an amendment to the order.

¶87 At oral argument, plaintiffs' counsel claimed Heinrich had issued twenty-three different emergency orders. I take judicial notice that PHMDC's website confirms the accuracy of this statement.[10] For the better part of two years, the people of Dane County have been subjected to a constantly shifting regulatory regime, rendering compliance illusory and objections futile. As even the majority acknowledges, Heinrich's orders have "requir[ed] face coverings, limit[ed] or forbid[den] gatherings, require[ed] sanitation protocols for particular facilities, limit[ed] or forbid[den] certain sport activities, limit[ed] businesses' allowable indoor capacity, and requir[ed] physical distancing between individuals."[11] In abstract terms, these measures may not seem particularly burdensome; in reality they were oppressive. As but one representative example, Heinrich banned small gatherings in private homes over

---

[10] Current Orders, PHMDC (last visited June 2, 2022), https://publichealthmdc.com/coronavirus/current-order.

[11] Majority/lead op., ¶4.

9

Thanksgiving, giving a mere week's notice of this diktat.[12]  She threatened $1000 fines for violations.

¶88 Rather than respond to any of the legal analysis in this dissent, the majority instead castigates its author for characterizing Heinrich's actions in terms of tyranny, autocracy, dictatorship, and despotism.  There are no more fitting words to describe the arrogation of power Heinrich wields.  James Madison forewarned that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced <u>the very definition of tyranny</u>."  <u>The Federalist No. 47</u>, at 373-74 (James Madison) (John C. Hamilton ed., 1882) (emphasis added).

¶89 Because his legal analysis of the non-delegation doctrine collapses under the weight of founding principles and more than 100 years of Wisconsin precedent applying them, Justice Brian Hagedorn attempts to marginalize this opinion as

---

[12] Demonstrating that judicial review is an inadequate procedural safeguard, this court denied an original action challenging this particular order brought by two of the plaintiffs in the present case, over the strong dissent of three justices.  <u>Gymfinity v. Dane County</u>, No. 2020AP1927-OA, unpublished order, at 3 (Wis. Dec. 21, 2020) (Roggensack, C.J., dissenting) ("While this court has recently received a barrage of petitions to commence original actions, when it is presented to us that fundamental personal liberty is suppressed by an unelected official, we must act.  Waiting until the matter proceeds through a circuit court and the court of appeals will be justice denied.").  The petition was filed on November 23, 2020——this court did not act until December 21 of that year, by which time, the Thanksgiving turkey was definitely cold.  The plaintiffs inform us they waited four months for a temporary injunction decision from the circuit court.

"miss[ing] th[e] point" by spending "considerable time" "criticizing" Heinrich's "choices."[13] It is, of course, customary for any judicial opinion to relay the facts of the case; this 53-page opinion spends four paragraphs reciting them while the remaining 72 paragraphs expound the law. Justice Hagedorn simultaneously suggests the facts are irrelevant to the legal issues before us while rejecting "the petitioners' arguments under the unique facts of this case."[14] The facts illustrate the raison d'être for the non-delegation principle: protecting the people from governmental encroachments on their liberty. Like the Wizard of Oz, Justice Hagedorn says, "[p]ay no attention to that man behind the curtain!" The Wizard of Oz (1939). But the public has a "right to know" the truth. See Hawkins v. Wis. Elections Comm'n, 2020 WI 75, ¶14, 393 Wis. 2d 629, 948 N.W.2d 877 (Roggensack, C.J., dissenting).

¶90 A "public servant" who exceeded her lawful authority has no ground to argue she was "merely doing her job[.]"[15] As a government official, Heinrich has an obligation to perform her duties within constitutional confines even if a majority of this court is not willing to enforce those boundaries. History is replete with examples of abuses by public officials who rationalized their actions as "just doing their jobs."

---

[13] Concurrence, ¶66 n.46.

[14] Id., ¶50 (emphasis added).

[15] Teigen v. Wis. Elections Comm'n, 2022 WI __, ¶247 n.17, __ Wis. 2d __, __ N.W.2d __ (Ann Walsh Bradley, J., dissenting).

11

¶91 Heinrich is a powerful government official, not a powerless victim who has been dragged to court, as the majority insinuates. Heinrich is a named party in this case——she has had every "opportunity to defend herself"[16] (and to prosecute her own counterclaims, for that matter). In contrast, defending government overreach is difficult, as evidenced by the majority glossing over the facts of this case and refusing to apply governing law.

¶92 Instead of defending liberty, the majority tries to conceal tyranny with benevolent motives. "[T]he greatest threats to our system of constitutional liberties may arise when the ends <u>are</u> laudable, and the intent <u>is</u> good——especially in an emergency." <u>County of Butler v. Wolf</u>, 486 F. Supp. 883, 890 (W.D. Penn. 2020). However well-intentioned, a government official who employs her powers to prohibit families from enjoying Thanksgiving dinner together and who threatens hefty financial sanctions for noncompliance has become the people's master rather than their servant. "Thomas Jefferson advised against being 'deluded by the integrity of' governmental actors' 'purposes' and cautioned against 'conclud[ing] that these unlimited powers will never be abused' merely because current office holders 'are not disposed to abuse them.'" <u>Palm</u>, 391 Wis. 2d 497, ¶82 (Rebecca Grassl Bradley, J., concurring) (quoting Thomas Jefferson, <u>Notes on the State of Virginia</u>. Edited by William Peden. Chapel Hill: University of North Carolina Press for the Institute of Early American History and

---

[16] Majority/lead op., ¶44.

12

Culture, Williamsburg, Virginia, 1954. The Founders'
Constitution, Volume 1, Chapter 10, Document 9, http://press-
pubs.uchicago.edu/founders/documents/v1ch10s9.html. The
University of Chicago Press) (modification in the original).
"Jefferson forewarned that '[t]he time to guard against
corruption and tyranny, is before they shall have gotten hold on
us. It is better to keep the wolf out of the fold, than to
trust to drawing his teeth and talons after he shall have
entered.'" Id. (quoting Jefferson, Notes on the State of
Virginia). The majority stands by while unlimited powers are
abused, and does nothing to guard against the tyranny that has
already gotten hold of the people of Dane County.

## II.  ANALYSIS

### A.  The Non-Delegation Principle

¶93 Evidence of the non-delegation principle underlying
the separation of powers in the Wisconsin Constitution has been
well-documented by Wisconsin's seminal source for originalist
constitutional interpretation:

> In the formation of a state constitution it would be
> well to keep in view the principles upon which
> republican governments profess to be established. All
> legitimate power proceeds from the people. This could
> not be denied, even among men who wished to frame a
> monarchy. . . . [W]e sometimes find men, nominally
> liberal, practical tyrants. The governed should
> beware of transferring too much authority into the
> hands of rulers; for, forgetting that they are
> servants, they too often become masters of the people.
> Individuals are more ambitious and more tenacious of
> power than the mass, and all history has proved that
> in times of peace and quiet the former are apt to make
> inroads and aggressions upon the latter. . . . Under
> the head of implied and constructive powers, tyranny

13

> may find a plausible pretext to stamp his foot, rough-shod, upon the neck of the American eagle.

A Convention Editorial (1846), reprinted in The Movement for Statehood, 1845-46, at 309, 310-11 (Milo M. Quaife ed., Wis. Hist. Soc'y 1918).

¶94 The people of Wisconsin are the ultimate sovereign. Id. at 312 ("The persons that constitute the nation are the source of all delegated power."); Taxation——Borrowing Money (1846), reprinted in The Movement for Statehood, 1845-46, at 177, 179 ("There is no sovereign and independent power except in the people."). "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const. art. I, § 1. "Under the Wisconsin Constitution, government officials, whether elected or appointed, are servants of the citizens, not their masters." Palm, 391 Wis. 2d 497, ¶68.

¶95 The people have delegated to state government, subject to limits specified in the state constitution, powers they would otherwise inherently retain. In a sense, each branch of government is an "agent" of the people, capable of legitimately exercising only those powers the people have delegated to them. Philip Hamburger, Is Administrative Law Unlawful? 377 (2014); see also Taxation——Borrowing Money, at 179 ("The members of the legislature are the agents of the people. They act for the people by power of attorney."). Embodying this agency relationship, the constitution commands that "'[a]ll laws'

14

enacted pursuant to the Wisconsin Constitution begin with the phrase, '[t]he people of the state of Wisconsin, represented in the senate and assembly, do enact as follows.'" In re Amending Wis. Stat. §§ 48.299 & 938.299 Regulating the Use of Restraints on Child. in Juv. Ct. (Juv. Ct.), 2022 WI 26, ¶55 n.11, __ Wis. 2d __, __ N.W.2d __ (Rebecca Grassl Bradley, J., dissenting) (quoting Wis. Const. art. IV, § 17(1)). As our state's founders understood, "'[l]aw is an expression of the legislative will'——that is, an embodiment of the people's wishes, expressed by delegated authority." Legal Absurdities——Pleadings (1846), reprinted in The Movement for Statehood, 1845-46, at 467, 470 (quoting the Livingston Code).

¶96 Under the common law of agency, "the agent ordinarily cannot subdelegate the power to a sub-agent, as this runs counter to the apparent intent of the principal." Koschkee v. Taylor, 2019 WI 76, ¶54 n.5, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring) (quoting Hamburger, Is Administrative Law Unlawful?, at 380); see also Lang v. Lions Club of Cudahy Wis., Inc., 2020 WI 25, ¶40, 390 Wis. 2d 627, 939 N.W.2d 582 (lead op.) ("An agent may appoint a subagent only if the agent has actual or apparent authority to do so." (quoting Restatement (Third) of Agency § 3.15(2))). "In individual circumstances, this is a matter of personal freedom; in politics, it is a foundation of constitutional liberty." Hamburger, Is Administrative Law Unlawful?, at 380. Delegata potestas non potest delegari: no delegated powers can be further delegated. The non-delegation principle ensures only

15

the entity the people chose to entrust with power may exercise it, subject to limitations specified by the people.

¶97 The non-delegation principle traces its origins to English law. See Jarkesy v. Sec. & Exch. Comm'n, 34 F.4th 446, 460 n.12 (5th Cir. 2022) ("Principles of non-delegation had even taken hold in England before the American Founding." (citing Hamburger, Is Administrative Law Unlawful?, at 381)). Even the king of England, following the rise of popular sovereignty, was not permitted to transfer certain powers vested in him by Parliament. Sir Edward Coke explained:

> That the prosecution and execution of any penal statute cannot be granted to any, for that the act being made by the policy and wisdom of the parliament for the general good of the whole realm, and of trust committed to the King as to the head of the justice and of the weal public, the same cannot by law be transferred to any subject.

Penal Statutes (1605), Coke, Reports, 7:36b-37a; see also Hamburger, Is Administrative Law Unlawful?, at 381 ("[P]arliamentary subdelegations were widely understood to be unlawful. Englishmen of whiggish views tended to argue that legislative power came from the people and that the legislature therefore could not subdelegate its power to others.").

¶98 The United States adopted from England a similar understanding of the non-transferability of the people's grant of legislative power. Recent scholarship has explored this concept in detail. See Ilan Wurman, Nondelegation at the Founding, 130 Yale L.J. 1490 (2021); Philip Hamburger, Delegating or Divesting?, 115 Nw. U. L. Rev. Online 88 (2020). But see Nicholas Bagley, Delegation at the Founding, 121 Colum.

16

L. Rev. 277 (2021). The early nineteenth century debates and proceedings in the Congress of the United States document Congress' understanding of the non-delegation principle as a limit on transferring their authority:

- 1808: "[T]o suspend or repeal a law is a Legislative act, and we cannot transfer the power of legislating from ourselves to the President." 18 Annals of Cong. 2125 (1808).

- 1810: "It seems to me with equal constitutionality we might refer to the President the authority of declaring war, levying taxes, or of doing everything which the Constitution points out as the duty of Congress. All legislative power is by the Constitution vested in Congress. They cannot transfer it." 21 Annals of Cong. 2022 (1810).

- 1818: "Legislative power, when granted, is not transferable; nor can it be exercised by substitute; nor in any other manner than according to the constitution granting it." 31 Annals of Cong. 1144 (1818).

¶99 Wisconsin's founders adopted a system of government similar in structure to the government designed under the United States Constitution. "Like its federal counterpart, '[o]ur state constitution . . . created three branches of government, each with distinct functions and powers,' and '[t]he separation of powers . . . is implicit in this tripartite division.'" Gabler v. Crime Victims Rts. Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384 (quoted source omitted; alternations in original). "Three clauses of the Wisconsin Constitution embody this separation: Article IV, Section 1 ('[t]he legislative power shall be vested in a senate and assembly'); Article V, Section 1 ('[t]he executive power shall be vested in a governor'); and Article VII, Section 2 ('[t]he judicial

17

power . . . shall be vested in a unified court system')." Id. (citation omitted). As a general rule, "[o]ur constitutional structure confers no authority on any branch to subdelegate any powers the sovereign people themselves delegated to particular government actors." Fabick v. Evers, 2021 WI 28, ¶56, 396 Wis. 2d 231, 956 N.W.2d 856 (Rebecca Grassl Bradley, J., concurring). "A strict accountability from public officers will be required, and the will of the people be the great governing voice . . . . [The people] will not permit their popular sovereignty to be delegated to others who now, because dressed 'in a little brief authority' arrogate to themselves the authority of being thinkers for the people, and 'the tongues o' the common mouth.' To us such considerations are more weighty than gold." State Government——No. 1, reprinted in The Movement for Statehood, 1845-46, at 372, 375-76.

¶100 As is self-evident from the three vesting clauses, "[t]he people vested the [lawmaking] power in the legislature—not the executive and certainly not the judiciary." Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶69, 399 Wis. 2d 623, 967 N.W.2d 469 (citing Fabick, 396 Wis. 2d 231, ¶55). This power includes the authority to: (1) "declare whether or not there shall be a law"; (2) "determine the general purpose or policy to be achieved by the law"; and (3) "fix the limits within which the law shall operate." Koschkee, 387 Wis. 2d 552, ¶11 (majority op.) (quoting Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 59, 158 N.W.2d 306 (1968)).

¶101 "The legislative power is 'the supreme power' because of its extraordinary reach[.]" Juv. Ct., __ Wis. 2d __, ¶44 (quoting Locke, Second Treatise of Government, § 134). Therefore, "[l]aw-making is the platonic ideal of a '[c]ore power[],' which is 'not for sharing.'" Id., ¶46 (quoting Fabick, 396 Wis. 2d 231, ¶58). The people granted the lawmaking power to the legislature subject to many conditions designed to inhibit most ideas from ever becoming law. "Bicameralism and presentment are the crucible bills must overcome to become law. By design, it is much more difficult than rule by dictatorship." Id., ¶55 n.11; see also Gundy v. United States, 585 U.S. __, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting) ("An 'excess of law-making' was, in [the framers'] words, one of 'the diseases to which our governments are most liable.' To address that tendency, the framers went to great lengths to make lawmaking difficult."[17] (quoting The Federalist No. 62, at 378

_____

[17] Justice Hagedorn discounts "Montesquieu and Madison" as "helpful, but not sufficient" in construing the Wisconsin Constitution. Concurrence, ¶49. Our constitution was modeled after the United States Constitution——Wisconsin's founders were not working from a blank slate. The early debates at the time of Wisconsin's founding rely explicitly on The Federalist. E.g., An Abolitionist Subscriber's View (1847), reprinted in The Struggle over Ratification, at 639, 642 (Milo M. Quaife ed., Wis. Hist. Soc'y 1920) (citing The Federalist No. 39 (James Madison)). Our early decisions followed suit. E.g., Walker v. Rogan, 1 Wis. 511 (*597), 527 (*616) (1853). Evidencing the enduring recognition of the Framers' influence over the writing of our state constitution, over the last 50 years The Federalist has been cited in nearly 50 Wisconsin appellate opinions. The father of the United States Constitution and those who influenced the founders' views on governance obviously "inform our understanding of the separation of powers under the Wisconsin Constitution." Gabler v. Crime Victims Rts. Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384.

(Alexander Hamilton) (C. Rossiter ed. 1961))). "Because the people gave the legislature its power to make laws, the legislature alone must exercise it." Johnson, 399 Wis. 2d 623, ¶69 (quoting Fabick, 396 Wis. 2d 231, ¶56). "Safeguarding" the legislature's exclusive domain "is particularly important in light of its awesome sweep." Id. (quoting Fabick, 396 Wis. 2d 231, ¶55).

¶102 "In the early years of Wisconsin's statehood, this court understood that the three branches of government could not delegate their vested powers, imposing substantive limitations on the legislature's assignment of authority to the executive to carry out the legislature's policies." Fabick, 396 Wis. 2d 231, ¶64; see also Joseph A. Ranney, Trusting Nothing to Providence: A History of Wisconsin's Legal System 377 (1999) ("Beginning with the controversy over municipal financing of railroads in the 1850s, the issue of what powers the legislature could confer on subordinate units of government arose regularly in Wisconsin. The Wisconsin Supreme Court adopted the . . . doctrine followed in most American states as a partial answer to the problem. The doctrine stated in essence that the legislature could grant power to subordinate units to implement its policies but not to make their own."). For example, in Dowling v. Lancashire Ins. Co., this court held "a law must be complete, in all its terms and provisions, when it leaves the legislative branch of the government, and nothing must be left to the judgment of the electors or other appointee or delegate of the legislature." 92 Wis. 63, 74, 65 N.W. 738 (1896) (emphasis added).

20

¶103 The majority/lead opinion dedicates much ink to statutory history in an effort to establish the legitimacy of delegations in the context of boards of health; however, it ignores one of this court's leading cases, State v. Burdge, (which was cited by the plaintiffs). 95 Wis. 390, 70 N.W. 347 (1897). In that case, this court examined a statute authorizing the state board of health "to make such rules and regulations and to take such measures as may, in its judgment, be necessary for the protection of the people from Asiatic cholera, or other dangerous disease[s]." Id. at 398. The act noted it was to "be construed and understood" to cover "such diseases as the state board of health shall designate as contagious and dangerous to the public health." Id. at 401. Purporting to act in accord with these statutes, the state board of health implemented a vaccination requirement in schools in response to Smallpox cases. Id. at 405. Through a "single stroke of the pen" and without any input from the legislature, the board of health "excluded from the common schools" "every child of school age, throughout the entire state, that had not been vaccinated." Id. No statute explicitly permitted the exclusion of students based on vaccination status. Id. at 399.

¶104 After discussing Dowling, this court noted, "[t]he provisions of the statute import and include an absolute delegation of the legislative power over the entire subject here involved[.]" Id. at 401. The court recognized, however, that the board was a mere "administrative body[.]" Id. at 400. It had no "legislative power" and "no part of the legislative power

21

c[ould] be delegated by the legislature to [it]" or "any other department or body[.]" Id.

¶105 For the state board of health to act upon its administrative powers, it had to act pursuant to "some substantive provision of law to be administered and carried into effect." Id. at 402. Because no law explicitly permitted the exclusion of unvaccinated students, this court held the state board of health acted without authority notwithstanding its ostensible statutory powers "to take such measures as may, in its judgment, be necessary." Id. at 403. That statute was "quite general" and therefore not a source of rulemaking authority. Id. at 400. Extending its holding to both the "state board of health" and "local boards," the court emphasized that rulemaking by such bodies could be done only if the authorizing statute was sufficiently complete in and of itself that rulemaking did not "involve[] a discretion as to what [the law] shall be" but merely "discretion as to its execution[.]"[18] Id. at 401–02.

---

[18] The majority seems to believe the ultimate sources of the constitution's original meaning are early statutory enactments. Not so. Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶256 n.64, 400 Wis. 2d 626, 971 N.W.2d 402 (Rebecca Grassl Bradley, J., dissenting), rev'd sub nom. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. __, 142 S. Ct. 1245 (2022) (per curiam) ("The Legislative and Executive branches cannot, through tacit understanding, change the constitutional allocation of powers." (citing Bartlett v. Evers, 2020 WI 68, ¶210, 393 Wis. 2d 172, 945 N.W.2d 685 (Kelly, J., concurring/dissenting))).

"We may look to 'three primary sources in determining the meaning of a constitution provision: [1] the plain meaning, [2] the constitutional debates and practices of the time, and [3] the earliest interpretations of the provision by the

22

¶106 Justice Hagedorn trivializes <u>Burdge</u> because the case was decided in 1897, a few decades after the state's founding. Concurrence, ¶11 ("The major difficulty with the petitioners' plea is they make little effort to ground either their claims or their proposed framework in the original understanding of the Wisconsin Constitution. Instead, they point to our 1896–1927 cases and offer theories about nondelegation under the federal constitution.").

---

legislature, as manifested through the first legislative action following adoption.'" <u>Black v. City of Milwaukee</u>, 2016 WI 47, ¶54, 369 Wis. 2d 272, 882 N.W.2d 333 (Rebecca Grassl Bradley, J., concurring) (quoting <u>Diaryland Greyhound Park, Inc. v. Doyle</u>, 2006 WI 107, ¶19, 295 Wis. 2d 1, 719 N.W.2d 408) (modifications in the original). The ordering of these sources reflect their legal weight, i.e., plain meaning is most important while early statutory enactments are least indicative. <u>Id.</u> & n.2. "In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others. . . . Many decisions of this Court, however, have unequivocally reaffirmed the holding of <u>Marbury v. Madison</u> that '(i)t is emphatically the province and duty of the judicial department to say what the law is.'" <u>Id.</u>, ¶54 n.2 (quoting <u>United States v. Nixon</u>, 418 U.S. 683, 703 (1974) (modification in the original)).

As the United States Supreme Court recently reiterated, "post-ratification adoption or acceptance of laws that are <u>inconsistent</u> with the original meaning of the constitutional text obviously cannot overcome or alter that text." <u>N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. __, No. 20-843, slip op. at 27-28 (June 23, 2022) (quoting <u>District of Columbia v. Heller</u>, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Under the majority's logic, the Alien & Sedition Acts are proof positive of the First Amendment's meaning. Legislatures often adopt laws without a full appreciation of the relevant constitutional implications; judicial review exists for a reason.

¶107 Burdge undoubtedly stands as evidence of original meaning. The opinion was authored by Justice Silas U. Pinney, who was born in 1833. Former Justices: Justice Silas U. Pinney, Wis. Ct. Sys. (last visited June 27, 2022), https://www.wicourts.gov/courts/supreme/justices/retired/pinney. htm. "Upon his death in 1899, it was believed that he had argued more cases before the Wisconsin Supreme Court than any other lawyer in the state. In the 100 volumes of the Wisconsin Reports printed by the time of his death, his name appeared as either counsel or justice in all but the first two volumes." Id. Justice Pinney was also one of this state's first judicial opinion reporters. "In 1872, [Justice] Pinney gathered the opinions of the territorial Supreme Court and the original state Supreme Court and published them in three volumes called Pinney's Wisconsin Reports. The first volume includes [Justice] Pinney's written history of the Wisconsin Territory." Id. He also served as a state legislator and the mayor of Madison prior to his election to the state supreme court. Id. A respected jurist, Justice Pinney wrote a unanimous decision in Burdge, and given his background, the fact that he wrote it in 1897 instead of 1857 (or whatever arbitrary date Justice Hagedorn has in mind) does not impair its persuasive value.

¶108 On the merits, Justice Hagedorn fundamentally mischaracterizes Burdge, block quoting a single sentence from the opinion completely out of context in order to suggest Burdge says the exact opposite of its actual holding. Justice Hagedorn truncates Burdge to the following passage:

24

It cannot be doubted but that under appropriate general provisions of law, in relation to the prevention and suppression of dangerous and contagious diseases, authority may be conferred by the legislature upon the state board of health or local boards to make reasonable rules and regulations for carrying into effect such general provisions, which will be valid, and may be enforced accordingly.

In the sentences immediately following, Burdge goes on to explain the authority the legislature may confer on local boards (not unelected bureaucrats) to make "reasonable rules and regulations" does not include discretionary decisions about what the law itself may be; rather, the authority conferred is limited to how the law may be executed:

The making of such rules and regulations is an administrative function, and not a legislative power, but there must first be some substantive provision of law to be administered and carried into effect. The true test and distinction whether a power is strictly legislative, or whether it is administrative, and merely relates to the execution of the statute law, 'is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law.' The first cannot be done. To the latter, no valid objection can be made. . . . Where an act is clothed with all the forms of law, and is complete in and of itself, it may be provided that it shall become operative only upon some certain act or event, or, in like manner, that its operation shall be suspended; and the fact of such act or event, in either case, may be made to depend upon the ascertainment of it by some other department, body, or officer, which is essentially an administrative act.

95. Wis. at 401-02 (emphasis added). Applying these principles, the court in Burdge concluded "the rule under consideration could be made operative only as an act of legislative power, and it does not come within the domain of the power to make

25

rules and regulations in aid or execution of some general statutory provision." <u>Id.</u> at 403.

¶109 Justice Hagedorn also misconstrues <u>Burdge</u> as endorsing the legislature's authority to delegate its lawmaking powers to <u>local health officials</u>. It doesn't say that. The case considered only whether "authority may be conferred by the legislature <u>upon the state board of health or local boards</u>." <u>Id.</u> at 401. The court emphasized "the importance and necessity of a strict adherence to the constitutional rule, that the power to make the law cannot be delegated to any board or body <u>not directly responsible to the people</u>." <u>Id.</u> at 404 (emphasis added). If, as <u>Burdge</u> concluded, the power to make the law cannot be delegated to a state or local board of health, it certainly may not be delegated to a local health officer who is undisputedly "not directly responsible to the people." <u>Burdge</u>'s conclusion faithfully follows the Wisconsin Constitution, under which "[t]he legislature may confer upon the <u>boards of supervisors</u> of the several counties of the state such powers of a local, legislative and administrative character as they shall from time to time prescribe." Wis. Const. art. IV, § 22 (emphasis added). Justice Hagedorn's conclusion does not.

¶110 "[I]n the wake of the Progressive era, this court began to uproot substantive limits on the legislature's delegation of its constitutionally-conferred powers, thereby damaging the 'foundation of American representative government' that is the separation of powers." <u>Fabick</u>, 396 Wis. 2d 231, ¶64 (quoting Gary Lawson, <u>Delegation and Original Meaning</u>, 88 Va. L.

26

Rev. 327, 332 (2002)); see also Ranney, Trusting Nothing to Providence, at 377 ("The line between making and implementing policy blurred substantially during the Progressive era as large administrative agencies came into operation for the first time. During the 1920s and 1930s, the supreme court, urged on by Chief Justice Rosenberry, was one of the first in the nation to acknowledge that the traditional delegation doctrine was dead and that henceforth, administrative agencies must effectively be treated as a separate branch of government.").

¶111 Although on paper this court claims to require some substantive limits on delegated legislative power, it has heavily preferred "procedural safeguards." Fabick, 396 Wis. 2d 231, ¶66 ("More accurately, the constitution's substantive limitations on delegating authority are all but dead. In their place survives judicial complacence with transfers of legislative power, '[s]o long as there are adequate procedural safeguards' in place to limit executive overreach." (quoting Gilbert v. State, Med. Examining Bd., 119 Wis. 2d 168, 186, 349 N.W.2d 68 (1984))). Such complacence does not comport with the original meaning of the vesting clauses, which the court has an obligation to restore. Id., ¶68.

### B. The Non-Re-Delegation Doctrine

¶112 The history of the non-delegation doctrine provides helpful context for understanding the illegitimacy of delegating already-delegated legislative power. County boards of supervisors have no inherent power.[19] Town of Vernon v. Waukesha

---

[19] Unlike municipalities, counties lack constitutional home rule. See Wis. Const. art. XI, § 3(1) ("Cities and villages

County, 102 Wis. 2d 686, 689, 307 N.W.2d 227 (1981) ("[A] county board has only such powers as are expressly conferred upon it or necessarily implied from the powers expressly given or from the nature of the grant of power."). They have only those powers the legislature decides to confer upon them. This is a subdelegation of power actually authorized by the people under Article IV, Section 22 of the Wisconsin Constitution.

¶113 Absent the people's express consent to confer on county boards of supervisors some limited lawmaking power, the non-delegation principle would otherwise prohibit the legislature from transferring even a small portion of its power to any other entity. Under Article IV, Section 1 of the Wisconsin Constitution, "[t]he legislative power shall be vested in a senate and assembly." This vesting clause prohibits the legislature from giving away its lawmaking power. Fabick, 396 Wis. 2d 231, ¶55. It was based on the United States Constitution's legislative vesting clause, in which "the 'people had vested the power to prescribe rules limiting their liberties in Congress alone'——not the executive." Id. (quoting Gundy, 139 S. Ct. at 2133). Article IV, Section 22 was created as a carve out to this rule. As one scholar noted, Section 22 "seems puzzling" if it was not "drafted to forestall an objection based on the non-delegation doctrine." Michael E. Libonati, "Neither

_____

organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village. The method of such determination shall be prescribed by the legislature.").

28

Peace Nor Uniformity": Local Government in the Wisconsin Constitution, 90 Marq. L. Rev. 596, 598 (2007).

¶114 The history of Article IV, Section 22 of the Wisconsin Constitution confirms it creates an exception to the non-delegation principle. The language of this section was taken from the 1846 New York Constitution. Id.; see also The Constitution——No. 6 (1847), reprinted in The Struggle over Ratification, at 474, 482 (Milo M. Quaife ed., Wis. Hist. Soc'y 1920) ("The nearer home all legislation is brought, the better and safer it is: that problem was well settled by the admirable town governments in New England."). The New York representative who introduced the language at that state's convention explained:

> Sir, the first section of the article to which this is offered as an amendment, provides that the entire legislative power of the state shall be vested in the Senate and Assembly. It is therefore my opinion that powers of local legislation cannot be conferred upon the several boards of supervisors, without a constitutional section permitting the state legislature to delegate such power.

Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of New-York 1070 (1846) (statement of R. Campbell, Jr.).

¶115 Article IV, Section 22 of the Wisconsin Constitution was an "experiment" and this state's founders accordingly proceeded with great caution. The Constitution——No. 6, at 482. In theory, "[i]f each state can legislate better for itself than Congress could, each county in the state can for itself better than can the state at large[.]" Id. Nevertheless, local

29

legislative control needed to be cabined because it was "untried, and the details full of difficulty." Id. The author of The Constitution——No. 6, a source for the original meaning of Article IV, Section 22, explained that "it will take some time and some experience to settle well and finally the bounds of local legislation. Accordingly this constitution simply provides that the legislature shall establish . . . county government and may confer upon the county boards of supervisors such powers of local legislation and administration as they shall from time to time prescribe." Id. The author predicted "the seed is sown, and the harvest will ripen in due time and after due development." Id. Article IV, Section 22 has never been amended. The founders' "experiment," reflecting a cautious view of delegated county power, continues in its original form. Our founders did not envision this "experiment" with subdelegation being corrupted by further levels of delegation to which the people never consented.

¶116 Article IV, Section 22 of the Wisconsin Constitution would be pure surplusage, its historical purpose contravened, and its existence utterly unnecessary if county boards of supervisors could subdelegate their lawmaking power. See Appling v. Walker, 2014 WI 96, ¶23, 358 Wis. 2d 132, 853 N.W.2d 888 (explaining constitutional language should be read to "give reasonable effect to every word," so as to "avoid surplusage" (quoting C. Coakley Relocation Sys. Inc. v. City of Milwaukee, 2008 WI 68, ¶17, 310 Wis. 2d 456, 750 N.W.2d 900)); see also Antonin Scalia & Bryan A. Garner, Reading Law: The

Interpretation of Legal Texts 174 (2012) ("If possible, every word and every provision is to be given effect (<u>verba cum effectu sunt accipienda</u>). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."). Because an express grant of authority was necessary for the legislature to delegate its power to the county boards of supervisors for the purpose of experimentation, the absence of an equally express authorization of subdelegation confirms the people withheld their consent to subdelegations by the county boards. Nothing in the constitutional text, its structure, or its history establishes any exception, nor does an emergency such as the COVID-19 pandemic. See <u>Palm</u>, 391 Wis. 2d 497, ¶53 (majority op.) ("There is no pandemic exception . . . to the fundamental liberties the Constitution safeguards." (citation omitted) (ellipsis in the original)); <u>Fabick</u>, 396 Wis. 2d 231, ¶50 ("Even in a pandemic, the government 'cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained.'" (quoting <u>A.L.A. Schechter Poultry Corp. v. United States</u>, 295 U.S. 495, 530 (1935))).

¶117 More than a century of precedent uniformly preserved the non-re-delegation principle as applied to county boards of supervisors. Consistent with the original meaning of Article IV, Section 22, the Wisconsin Supreme Court invariably enforced the prohibition on re-delegation of the supreme power——irrespective of substantive or procedural safeguards. Although

31

this court has corrupted the non-delegation principle, its non-re-delegation jurisprudence faithfully followed the constitution until its debasement in this case.[20]

¶118 In French v. Dunn County, the Dunn County Board of Supervisors decided to purchase land for a "poor-farm"[21] via a committee of three supervisors. 58 Wis. 402, 404, 17 N.W. 1 (1883). This court determined "[t]here can be no just claim that the committee did not act strictly within the scope of the authority conferred by the resolution." Id. at 405. For this reason, it upheld the purchase, which the court emphasized was not an act of lawmaking power. Id. at 408. Its holding was limited: "There are, doubtless, powers vested in the county board which could not be delegated to any committee. Powers which are legislative in their character . . . must be exercised under the immediate authority of the board." Id. at 406.

¶119 The next relevant case chronologically remains the seminal decision interpreting Article IV, Section 22 of the Wisconsin Constitution. See Meade v. Dane County, 155 Wis. 632, 145 N.W. 239 (1914). The Dane County Board of Supervisors

_____

[20] Justice Hagedorn conflates the non-delegation principle with the non-re-delegation doctrine. Regardless, he too acknowledges that in regard to the former, this court long ago "closed this chapter" and has "declined to fastidiously police the line between a permissible legislative grant of power and an impermissible delegation of legislative power." Concurrence, ¶54. Just because prior courts failed to uphold our constitution does not give this court license to perpetuate its dereliction of duty.

[21] See generally poor farm, Shorter Oxford English Dictionary (6th ed. 2007) ("A farm run at public expense to house and support the poor.").

32

approved the purchase of farmland for $24,200 and directed the chairman of the board, the county clerk, and the district attorney to complete the purchase. Importantly, the board intended to add the land to the existing county poor farm.

¶120 This proposed purchase generated significant controversy. Dane County residents filed three petitions under Wis. Stat. § 39j (1911) challenging the plan. That statute stated, in relevant part:

(1) . . . [N]o ordinance or resolution of any county board shall go into effect within twenty days from the time of its passage[.] . . .

(2) An emergency ordinance or resolution shall be any ordinance or resolution . . . making any appropriation for maintaining the . . . county government or maintaining or aiding any public institution. . . .

(3) If within twenty days after the passage and publication of any ordinance or resolution, a petition, signed by qualified electors of the city or county equal in number to at least twenty per cent. of all the votes cast for Governor in such . . . county at the last preceding regular election, shall be filed with the . . . county clerk and certified by him to the . . . county board, praying that the operation of such ordinance or resolution be suspended, the operation of such ordinance or resolution, unless the same shall be an emergency ordinance or resolution, shall be suspended. At its next regular meeting, . . . the . . . county board shall consider such ordinance or resolution, and either repeal it or submit it to the electors of the . . . county at the next regular election or at a special election, to be called for that purpose . . . . If any such ordinance or resolution shall be approved by a majority of the electors voting thereon, it shall take effect and be in force from and after twenty days from the date of the election.

33

> (4) An emergency ordinance or resolution shall remain in force notwithstanding any petition filed upon it, but such ordinance or resolution shall stand repealed from and after twenty days after being rejected by a majority of the qualified electors voting thereon.

§ 39j. When the petitions were presented to the Dane County Board of Supervisors, it refused to act. It neither repealed its plan nor provided for its submission to a vote of the people, as purportedly required by § 39j. Instead, the board proceeded to pay $1000 of the $24,200 but was enjoined from paying the remainder following the filing of a lawsuit by a Dane County resident and taxpayer. The circuit court ruled in favor of the plaintiff.

¶121 On appeal, this court reversed and remanded with directions to dismiss the complaint. Meade, Wis. at 645. When a county board of supervisors enacts ordinances and resolutions, the court recognized "the county acts by delegated authority, and the state Constitution (section 22, art. 4) expressly authorizes the Legislature to confer upon the boards of supervisors of the several counties 'such powers of a local, legislative, and administrative character.'" Id. at 642-43. It then noted the plan of the Dane County Board of Supervisors was an "emergency order or resolution" because it was intended to benefit the poor farm. Id. at 643. Accordingly, "by subdivision 4 [of Wis. Stat. § 39j] the action of the county board [wa]s not merely to go into effect upon the contingency that a majority of the electors declare[d] it, but, on the contrary, t[ook] effect from the time of its passage[.]" Id. The statute purported to authorize the voters not just to

34

approve a law before it went into effect but to "repeal[]" a law already in effect. Id. This court concluded the legislature could not create a statute "delegating to the electors the legislative power of repeal" because such a statute "vest[ed] in the electors of the county the powers which the Constitution says may be vested in the county board." Id. "The Constitution provides for and authorizes a delegation of such powers to a specified body. Expressio unius est exclusio alterius. In that section 39j conflicts with the Constitution." Id.

¶122 This court held Wis. Stat. § 39j conflicted with the Constitution in at least two respects: "(1) Because it violates section 22 of article 4 in attempting to delegate to the electors powers which that section, interpreted by the regular rules of interpretation . . . requires to be otherwise delegated. (2) Because, as regards emergency resolutions there defined, which includes the resolutions in question here, the statute is an attempted delegation of the legislative power of repeal." Id. at 644. This court rebuked the enactment of statute with decidedly strong language: "The statute in question seems to have been framed in entire unconsciousness of fundamental principles, and we have no reasonable doubt of its invalidity." Id. at 645. It reiterated its concern multiple times, even declaring ordinances in force pending possible repeal unconstitutional. Id. at 644 ("As to all ordinances, and as to those resolutions which are in effect ordinances, declared by said section to be in force and effect until repealed by the electors, this is a delegation of legislative power and

35

forbidden by constitutional law."); id. at 645 ("As to all other resolutions of the county board, this is a delegation of administrative power, and this class of powers the Constitution (Section 22, art. 4) permits to be delegated only to the county board.").

¶123 Meade was followed a few months later by State ex rel. Carey v. Ballard, 158 Wis. 251, 148 N.W. 1090 (1914). In that case, this court reviewed the constitutionality of a statute delegating the legislative power "to levy a tax" to a group of freeholders within a county. Id. at 256. While that case concerned whether the statute violated the legislative vesting clause, not Article IV, Section 22 of the Wisconsin Constitution, its reasoning is nevertheless relevant. This court recognized then (as it should now) "[u]nder our constitutional form of government the Legislature cannot delegate legislative power to any officer or to any body of persons, individual or corporate, aside from the power to confer local legislative and administrative powers on county boards and municipal corporations." Id. at 257 (citations omitted); see also In re Village of N. Milwaukee, 93 Wis. 616, 621, 67 N.W. 1033 (1896) ("[T]he legislature may delegate local legislative and administrative powers to county boards of supervisors, and to no other officer or body, save in so far as it may delegate powers of local self-government to municipal corporations." (emphasis added)); 1 County Government in Wisconsin 7 (Univ. of Wis. & Wis. Hist. Soc'y 1942) ("At its first session, the State Legislature provided for the

36

establishment in each county of a board of supervisors, . . . which was to be the only body competent to exercise the powers of the county as a body politic."). "In conferring the taxing power on these local governments the legislature must provide for its exercise by the proper legislative authority of the local government." Carey, 158 Wis. at 257 (citation omitted). The court explained that local legislative power had to be "exerted . . . either directly [by the senate and assembly] or through the officers of a political subdivision who act in their capacity of legislative representatives of the people[.]" Id. at 258. It declared the statute unconstitutional because "the Legislature acted in excess of its power in attempting to vest authority for the imposition of a tax for improving highways in a body of freeholders who are not elected by the people as their representatives, nor in any way responsible to them on account of the tax burdens they imposed." Id. at 260. Again, this court used unequivocal language: "[The statute] delegates . . . power to a group of persons in their individual capacity, which is condemned as contrary to the principles of representative government under our Constitution." Id. at 261.

¶124 Two years later, this court decided State ex rel. Nehbass v. Harper, 162 Wis. 589, 156 N.W. 961 (1916). That case examined subdelegation by a village board, not a county board of supervisors, and therefore did not directly concern Article IV, Section 22 of the Wisconsin Constitution. Nonetheless, it elucidates the non-re-delegation principle, specifically as

37

applied to local governments, analogizing to decisions such as
Ballard involving county boards. See id. at 593 (citing
Ballard, 158 Wis. at 257).

¶125 In Nehbass, the City of Milwaukee enacted an ordinance
that required a person desiring to erect, remodel, or maintain
certain types of buildings to first obtain "the written consent
of two-thirds of all the real estate owners within three hundred
feet of the space[.]" Id. at 590. This court struck the
ordinance as a violation of the non-re-delegation principle. In
supporting its decision, the court summarized its prior
holdings:

- "A legislative body cannot delegate to a mere
  administrative officer power to make a law . . . . In the
  present cast the ordinance by its terms gives power to the
  president to decide arbitrarily and in the exercise of his
  own discretion when a saloon shall close. This is an
  attempt to vest legislative discretion in him, and cannot
  be sustained."[22] Id. at 593 (quoting Village of Little
  Chute v. Van Camp, 136 Wis. 526, 527, 117 N.W. 1012
  (1908)).

- "A county board cannot delegate to one not a member of the
  board the power and authority to act as a member of the
  committee of the board." Id. (citing Forest County v.
  Shaw, 150 Wis. 294, 136 N.W. 642 (1912)).[23]

- "Under our constitutional form of government the
  Legislature cannot delegate legislative powers to any
  officer or to any body of persons, individual or corporate,
  aside from the power to confer local legislative and

---

[22] The ordinance read: "All saloons in said village shall
be closed at 11 o'clock p. m. each day and remain closed until 5
o'clock on the following morning, unless by special permission
of the president."

[23] Shaw appears to have been grounded in statutory law more
than constitutional principles.

administrative powers on county boards and municipal corporations." Id. (quoting Ballard, 158 Wis. at 257).

- "[In State v. O'Neill a statute] provided that a certain act should be void unless accepted by a majority of the legal voters of the city of Milwaukee . . . . This was held not to be a delegation of legislative power [because] the law was . . . '[a] complete enactment in itself; contains an entire and perfect declaration of legislative will; requires nothing to perfect it as a law; while it is only left to the people to be affected by it to determine whether they will avail themselves of its provisions." Id. at 594 (quoting O'Neill, 24 Wis. 149 (1869)).

Synthesizing these authorities, the court reasoned, "[i]f the state [by statute] cannot delegate [lawmaking power] certainly a common council cannot redelegate legislative power properly delegated to it." Id. at 593. Critically, "[t]he ordinance in question [unlike O'Neill] [wa]s not one left to take effect . . . upon the ascertainment of some prescribed fact . . . but attempt[ed] to delegate to property owners the right to say how a particular person shall use a particular piece of property[.]" Id. "[I]t is plain that the question of whether or not a garage shall be erected in a particular place is determined, not by the common council, but by the property owners." Id. at 594.

¶126 A few decades later, Marshall v. Dane County Board of Supervisors rehashed Meade. See 236 Wis. 57. The case considered a different, but analogous referendum statute. A petition was presented to the Dane County Board of Supervisors demanding the adoption of "a complete civil service ordinance[.]" Id. at 58. The relevant statute purported to require a county board presented with such a petition to pass

39

the proposed ordinance or submit it to a vote of the people. Id. As in Meade, the board refused to act; it neither voted to adopt an ordinance nor submitted it for a vote. Id.

¶127 This court concluded the case was governed by Meade. It reiterated the statute in Meade "was held unconstitutional by the court because the legislature could not empower a county board to delegate to the electors of the county a power by the Constitution expressly delegated to the county board itself." Id. at 59. The statute required county boards of supervisors presented with a proper petition to: (1) repeal the ordinance; or (2) submit the question of repeal to the people. That choice could not be forced upon the boards; the constitution prohibits boards from transferring their lawmaking power, even to the people, if the boards were unwilling to repeal the ordinance.

¶128 After summarizing Meade, this court held "[t]he power to enact such an ordinance must, under the constitutional provision cited, be vested by the legislature in the county board itself; the legislature cannot authorize the county board to delegate the power to enact an ordinance of such a character to the electors." Id. at 59. The decision was unanimous. If the lawmakers may not re-delegate their delegated power even to the people, it is logically impossible for county boards to redelegate their delegated power to an unelected bureaucrat.

¶129 Multiple Wisconsin Attorney General opinions interpret Article IV, Section 22 of the Wisconsin Constitution in accordance with this court's understanding of the text. On at least five occasions, the attorney general has concluded the

40

legislative powers of county boards of supervisors cannot be exercised by the electors of the county without violating the non-re-delegation principle.[24]

---

[24] 27 Wis. Att'y Gen. 161, 161 (1938) ("[D]irect legislation in counties by the electors is not permitted by the constitution. . . .  [A]rt. IV, sec. 22[] . . . empower[s] the legislature to confer upon the county boards the legislative power for the county and . . . therefore a statute providing for direct legislation in counties [i]s unconstitutional because it attempt[s] to confer legislative power upon the electors."); 22 Wis. Att'y Gen. 785, 785–86 (1933) ("The determination by a referendum vote to build a new courthouse would constitute direct legislation.  This department in a previous opinion . . . .  held that sec. 59.02 was unconstitutional in so far as it authorized referendum on legislative and administrative matters in counties. . . .  Since the question of building a new courthouse rests with the county board, its clerk has no authority to call a special meeting of the county board or file presentation of a referendum petition."); 21 Wis. Att'y Gen. 207, 208 (1932) ("The board must decide the question and such decision cannot be delegated to the electors."); 11 Wis. Att'y Gen. 106, 106–07 (1922) ("The case seems to me to fall within the language of the supreme court in Meade . . . where a similar referendum law was said to apply to any and every kind of action that might be taken by a county board.  The supreme court also held, however, in the Meade case that a statute of this kind is unconstitutional as applied to counties, for the reason that it violates sec. 22, art. IV . . . .  There is no question in my mind but that sec. 59.02, in so far as it provides for a referendum, is subject to all the infirmities pointed out by the supreme court in the statute involved in the Meade case.  I, therefore, conclude . . . that the question of employing a county agent cannot be lawfully determined by a referendum among the voters of the county."); 9 Wis. Att'y Gen. 66, 67–68 (1920) ("If the constitution does not permit direct legislation of the voters of the county on purchasing a poor farm, it does not permit such legislation on the subject of public schools. . . .  It seems to me that the decision in the Meade case completely rules this question. . . .  The Meade case was an effort to kill a resolution by having it referred to the electors.  This case is an effort to defeat an ordinance by enacting a repealing ordinance.  If one is legislation, so is the other, and legislation by direct action of the electors of counties is declared to be prohibited by the constitution and beyond the power of the legislature to confer.").

¶130 In at least one opinion, the attorney general concluded county boards of supervisors could not delegate lawmaking power to committees of the board. In 1972, the corporation counsel for Dane County requested an opinion on "whether a county board can delegate to a committee of the board the authority to make all appointments to county board committees created under sec. 59.06, Stats., without necessity of further action or confirmation by the board." 61 Wis. Att'y Gen. 214, 215 (1972). The attorney general responded, "[i]t is my opinion that the board is without such authority[.]" Id. Referencing Article IV, Section 22 of the Wisconsin Constitution, he reasoned, "[t]he board can exercise the legislative and administrative powers delegated to it by the legislature as a collective body." Id. (emphasis added). Because "[t]he power to create a committee and to provide for its scope and purposes is legislative in nature," he concluded it "could not be delegated to a committee." Id. at 216.

¶131 Treatises on municipal law similarly describe the non-re-delegation principle and acknowledge its present vitality. Constitutionally-ensconced since ratification and upheld by this court for nearly 140 years, it is black-letter law. See 2 Local Government Law § 13:13 (updated May 2022) ("[T]he doctrine that a legislative body cannot delegate its legislative powers applies to local governments."); 2A McQuillin Mun. Corp. § 10:45 (3d ed. updated Sept. 2021) ("So far as the powers of a municipal corporation are legislative they rest in the discretion and judgment of the municipal body entrusted with

42

them, and the general rule is that that body cannot delegate or refer the exercise of such powers to the judgment of a committee of the council, or to an administrative board or officer of the city, or to arbitrators under an agreement for binding arbitration.  If the legislature confers powers on a municipal corporation, the exercise of discretion by the governing body of the municipality cannot be delegated to a municipal officer or other person of body.").

¶132 The collective thrust of these binding decisions is relatively straightforward:  (1) Article IV, Section 22 of the Wisconsin Constitution does not allow the legislature to vest lawmaking power in a municipal officer or body other than the county boards of supervisors; (2) the non-re-delegation principle prohibits a county board of supervisors from giving any of its delegated lawmaking power to any person or other body——the power must be exercised by the whole board, collectively; (3) lawmaking means discretionary decisions that bind the public with the force of law; and (4) for an ordinance to be constitutionally valid, it must be complete and whole, requiring no further discretionary decisions of a substantive nature to carry its purpose into effect.  This court has consistently struck down subdelegations that caused substantially less intrusive infringements on fundamental liberties, e.g., invalidating a village ordinance that granted the village president the power to allow saloons to stay open late on a case-by-case basis.  Van Camp, 136 Wis. at 527.  The

43

majority refuses to apply Article IV, Section 22, but there is no statutory end-run around the constitution.

### C. The Unconstitutionality of Dane County's Ordinance & Heinrich's Orders

¶133 Having sworn oaths to support the Wisconsin Constitution, this court must assiduously protect the people's prerogative to decide who may govern them by enforcing the constitutional limitations on the exercise of power the people gave to particular public servants. Although Justice Hagedorn dismisses this principle as nothing more than "general theories of government power,"[25] "[p]reserving the perimeters of power constitutionally conferred on each branch of government is essential for securing the liberty of the people." Palm, 391 Wis. 2d 900, ¶70 (Rebecca Grassl Bradley, J., concurring). This duty becomes imperative when governmental actors conspire to collapse the carefully calibrated separation of powers among three branches in favor of consolidating power in a single, unelected bureaucrat.

¶134 "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 373-74. The Dane County Board bestowed on Heinrich "the three great powers of government," even though our constitutional order is founded on the axiom that they should be "ever . . . kept separate and distinct." Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67,

---

[25] Concurrence, ¶49.

¶87, 393 Wis. 2d 38, 946 N.W.2d 35 (Kelly, J., majority op.) (quoting 2 Joseph Story, Commentaries on the Constitution of the United States § 519, at 2-3 (Boston, Hilliard, Gray, & Co. 1833)). "Although consolidation of power in one person may be tempting in times of exigency, for purposes of expeditiously producing an efficient and effective response to emergencies like a pandemic, history informs of the perils of the consolidation of power, and not merely through the exhortations of the Founders and philosophers. Regrettably, we have tangible examples of judicial acquiescence to unconstitutional governmental actions considered——at the time——to inure to the benefit of society, but later acknowledged to be vehicles of oppression." Palm, 391 Wis. 2d 900, ¶70. "Careful judicial scrutiny is especially important in times of stress, when Americans may find themselves 'at the mercy of wicked rulers, or the clamor of an excited people.'" Id., ¶72 (quoting Stephen Dycus, Requiem for Korematsu, 10 J. Nat'l Sec. L. & Pol'y 237, 246 (2019)).

¶135 The facts of this case demonstrate the danger. Heinrich prosecuted a local business for allegedly violating her vague order. The County Board unlawfully gave her powers that no elected official in this state possesses: the power to write the rules, interpret their meaning, and impose punishments of her choosing for violations only she may declare. The ordinance by which the Board created this autocrat contains no legitimate limiting directives, instead incorporating by reference statutes similarly lacking any meaningful substantive constraints on her

45

power. See Wis. Stat. § 252.03(1) ("The local health officer shall promptly take all measures necessary to prevent, suppress and control communicable diseases, and shall report to the appropriate governing body the progress of the communicable diseases and the measures used against them, as needed to keep the appropriate governing body fully informed, or at such intervals as the secretary may direct.").

¶136 As interpreted by the majority, this statute violates the constitution as interpreted in Ballard, which held: "Under our constitutional form of government the Legislature cannot delegate legislative powers to any officer or to any body of persons, individual or corporate, aside from the power to confer local legislative and administrative powers on county boards and municipal corporations." 158 Wis. at 257. It is a substantially more open-ended grant of power than those this court has struck in previous cases, e.g., the grant in Van Camp. It mirrors the "take such measures as may, in its judgment, be necessary" language construed in Burdge, which this court held granted no rulemaking authority at all. See 95 Wis. at 398. It is also indistinguishable from the power this court held a state official could not exercise in Wisconsin Legislature v. Palm, 391 Wis. 2d 497 (majority op.). The majority silently overrules Palm, a decision from which three members of the majority in this case sharply dissented. Only a change in court membership enables the current majority to discard this quite recent precedent.

¶137 Such a broad grant, particularly without procedural safeguards, is patently unconstitutional. Id., ¶¶79-80 (Rebecca Grassl Bradley, J., concurring). Heinrich has been permitted to exercise "the supreme [lawmaking] power," with no pre-issuance procedural safeguards to limit the power from being applied arbitrarily and capaciously. See Juv. Ct., __ Wis. 2d __, ¶55 n.11 (quoting Locke, Second Treatise of Government, § 134); Palm, 391 Wis. 2d 497, ¶35 (majority op.) (explaining a procedural safeguard is inadequate if it can be applied only to undo an unlawful rule). Renouncing multiple precedents spanning more than a century, the majority accedes to Heinrich's arrogation of breathtaking power.

¶138 The majority's decimation of the non-delegation principle ignores controlling precedent on "procedural safeguards." Tellingly, in the majority/lead opinion's three paragraphs discussing procedural safeguards, it does not cite a single case; the precedent overlooked by the majority explicitly rebuts the majority's analysis. E.g., compare majority/lead op., ¶40 ("[S]tate courts may review an order issued pursuant to Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 and ensure its measures conform to the laws' substantive limitations."), with Palm, 391 Wis. 2d 497, ¶35 ("Palm cannot point to any procedural safeguards on the power she claims. At oral argument, she continuously referenced judicial review; but judicial review takes place after an allegation is made that an individual's rights have been violated. . . . Rulemaking provides the ascertainable standards that hinder arbitrary or

47

oppressive conduct by an agency. Judicial review does not prevent oppressive conduct from initially occurring."). In *Palm*, this court held procedural safeguards must resemble chapter 227's rulemaking procedures; nothing comparable inhibits Heinrich's exercise of unilateral power. *Palm*, 391 Wis. 2d 497, ¶34 ("Procedural safeguards, generally, are those requirements imposed by the Administrative Procedures Act, codified at ch. 227." (citation omitted)).

¶139 The majority claims it is merely applying existing precedent on the non-delegation principle; if the majority is sincere, its efforts betray a startling ignorance of a fundamental first principle. While ignoring the non-re-delegation principle entirely, the majority implicitly abrogates the non-delegation principle, facilitating unlimited future acts of tyranny akin to Heinrich's. The majority/lead opinion says, "[a]s with any legislative authority, the state legislature may curb exercises of granted power it deems excessive[.]"[26] The legislature <u>always</u> has such power (as even the majority acknowledges). The majority entirely misses the rationale underlying the non-delegation principle: if the people did not authorize the legislature to give its power away, its exercise by anyone other than the legislature is unlawful, and the legislature's ability to "curb" excess cannot cure the subdelegation's constitutional infirmity.

¶140 The Dane County Board of Supervisors exceeded its constitutional authority by assigning Heinrich such far-reaching

---

[26] Majority/lead op., ¶40.

powers. This subdelegation was substantively defective, even under a liberal reading of the long line of governing precedent. The Board's re-delegation imposed no meaningful procedural restraints on Heinrich's power. By judicial fiat, the majority endorses executive fiat, and the people's liberty languishes.

¶141 "Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf." Morrison v. Olson, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

III. THE MAJORITY/LEAD OPINION'S FLAWED STATUTORY ANALYSIS

¶142 In James v. Heinrich——a recent case challenging the exercise of power over the people by the same Dane County health officer named in this case——this court held that "if 'the legislature did not specifically confer a power,' the exercise of that power is not authorized." 2021 WI 58, ¶18, 397 Wis. 2d 516, 960 N.W.2d 350 (quoting State ex rel. Harris v. Larson, 64 Wis. 2d 521, 527, 219 N.W.2d 335 (1974)); see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs., 594 U.S. __, 141 S. Ct. 2485 (2021) (per curiam) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." (citation omitted)). This court held Wis. Stat. § 252.03's "reasonable and necessary" provisions did not grant Heinrich the power to "close schools." Among other reasons, such a generic

49

authorization "cannot be reasonably read to encompass anything and everything"; otherwise, it would swallow the rest of the statute, creating substantial redundancy. James, 397 Wis. 2d 516, ¶¶22-23. Additionally, Wis. Stat. § 252.02 specifically authorized DHS to "close schools," while a similar grant of authority was conspicuously absent from § 252.03. Id., ¶¶19-20.

¶143 Ignoring James allows the majority to avoid grappling with a fundamental flaw in its reasoning. Conspicuously absent from Wis. Stat. § 252.03 is any language granting local health officers the power to issue orders, a power Wis. Stat. § 252.02 explicitly grants to DHS. Under James, "if 'the legislature did not specifically confer a power,' the exercise of that power is not authorized." Id., ¶18 (quoting Harris, 64 Wis. 2d at 527).

¶144 Similarly, in Palm (another case ignored by the majority), this court held Wis. Stat. § 252.02's authorization to take "all emergency measures necessary" did not permit DHS to "confin[e] people to their homes, forbid[] travel [or] clos[e] businesses." 391 Wis. 2d 497, ¶¶45-59. "We cannot expansively read statutes with imprecise terminology that purport to delegate lawmaking authority to an administrative agency." Id., ¶55; see also id., ¶24 (noting skepticism toward an interpretation of a statute that would allow a single "unelected official[ to] create law applicable to all people during the course of COVID-19 and subject people to imprisonment when they disobeyed her order").

50

¶145 The majority's conclusions in this case cannot be reconciled with <u>James</u> or <u>Palm</u>, so the majority ignores those cases. Wisconsin Stat. § 252.03 cannot be read to give local health officers greater power to rule over the people than their state counterpart possesses. And a statute cannot override the constitutional constraints on the delegation of lawmaking power.[27]

## IV. CONCLUSION

¶146 [L]ocal assemblies of citizens constitute the strength of free nations. Town-meetings are to liberty what primary schools are to science; they bring it within the people's reach, they teach man how to use and how to enjoy it. A nation may establish a system of free government, but without the spirit of municipal institutions it cannot have the spirit of liberty.

1 Alexis Tocqueville, <u>Democracy in America</u> ch. V, Part I (1835).

¶147 Today's majority insulates local government from the oversight of the town hall meeting——a beacon of representative democracy——subjecting the people to the whims of an unaccountable overlord. The majority displaces the constitutional design for the exercise of lawmaking power with a "technocracy"[28] the majority favors. As Justice Patience Drake

---

[27] Justice Hagedorn apparently believes statutes take precedence over the constitution. Ignoring the glaring absence of any constitutional authority, Justice Hagedorn says penalizing the people for disobeying any order decreed by "local health authorities" is perfectly acceptable if the legislature says so, even though the people never consented. Concurrence, ¶64.

[28] <u>Technocracy</u>, <u>The American Heritage Dictionary</u> (5th ed. 2011) ("A government or social system controlled by technicians, especially scientists and technical experts.").

51

Roggensack described during oral argument in this case: "Counsel, I give you that a dictatorship which is what Heinrich exercised for about two years is the most efficient manner of handling a problem you're focusing on, but it is not necessarily a democratic manner." Efficiency bears a heavy price. A "technocratic" approach to government "drains public discourse of substantive moral argument and treats ideologically contestable questions as if they were matters of economic efficiency, the province of experts." See Michael J. Sandel, The Tyranny of Merit: What's Become of the Common Good 20 (2020). It tells the common citizen he has no right to participate in government, for he is not a "technical expert" and the complexities of modern life are "beyond the reach" of his feeble understanding. Id. "This narrow[ing]" of "democratic government" "hollow[s] out the terms of public discourse, and produce[s] a growing sense of disempowerment." Id.

¶148 In declaring independence from the crown, the Founders sought to escape despotism: "when a long train of abuses and usurpations, pursuing invariably the same Object evinces a design to reduce them under absolute Despotism, it is their right, it is their duty, to throw off such Government, and to provide new Guards for their future security." The Declaration of Independence para. 2 (U.S. 1776). Not only is it our constitutional duty to apply the original meaning of the Wisconsin Constitution's structural safeguards, it is essential to preventing the collapse of representative democracy. The

people of this state constitutionally constrained the exercise of power over them, but the majority refuses to enforce those limits, opting instead to "look[] the other way"[29] as unelected bureaucrats run roughshod over the people's liberty. For two years, "[s]eas would rise when [Heinrich] gave the word"; she "held the key" to power. ColdPlay, Viva La Vida (2008). Lacking any constitutional foundation, her usurped authority "stand[s] upon pillars of salt and pillars of sand" and nothing the majority says can fortify it. Id. The majority abandons its station as a bulwark of liberty. I dissent.

¶149 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this dissent.

---

[29] Concurrence, ¶53.